2: 15-cv-02136  #133      Page 1 of 3*~~0~~*

*Plus Attachments*

Friday, 29 September, 2017 04:00.00 PM

Clerk, US District Court, ILCD

# IN THE UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF ILLINOIS – URBANA DIVISION

HYE-YOUNG PARK, a/k/a LISA PARK

Plaintiff,

vs.

MICHAL T. HUDSON, individually,

HEIDI JOHNSON, individually,

CHARLES SE*O*CLSKY, individually,

ROBERT STAKE, individually,

and THE BOARD OF TRUSTEES OF

THE UNIVERSITY OF ILLINOIS

Defendants

Case No. 15-cv-2136



FILED

OCT – 3 2017

CLERK OF THE COURT
U.S. DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

## **MOTION FOR SUMMARY JUDGMENT**

TO:  M. Dennis Mickunas,

MICKUNAS LAW FIRM

Attorney for the Plaintiff Hye-Young Park

312 Yankee Ridge Ln.

Urbana, IL. 61802


Brian M. Smith

Keith E. Fruehling

Attorney for the Defendant The Board of

Trustees of the University of Illinois

Heyl, Royster, Voelker & Allen

301 N. Neil Street, Suite 505

Champaign, IL. 61824


Gary R. Lietz

Attorney for Defendant Robert Stake

Lietz, Banner, Ford LLP

Suite 103

1605 S. State Street

Champaign, Illinois 61820

Telephone: 217-353-4900

glietz@lbflaw.com


United States Federal District Court Clerk

201 South Vine Street,

Urbana, Illinois 61802

217-373-5830

*Attn: Judge Colin Bruce*

YOU AND EACH OF YOU WILL HEREBY TAKE NOTICE that on FRIDAY, September 29, 2017 AT 4:00 p.m. Eastern Daylight Time/ 3:00 p.m. Central Daylight Time, the Defendant CHARLES SECOLSKY, representing himself will file a motion for summary judgment with all of the parties listed above by express mail to arrive in the possession of each party by the allowed extended deadline date, pursuant to the ruling of the U.S. District Court motion eligible for all parties, which is Monday, October 2, 2017. The reason for the motion of summary judgment is for compete dismissal of Case 15-cv-2136 for Charles Secolsky on all counts as is

provided in the plaintiff's lawsuit. Furthermore, from researching documents that have already filed as part of the record, we will make the case as part of this motion that the plaintiff exhibited fraudulent actions and unethical behavior in attempting to achieve underserving personal gains by way of this lawsuit. Such actions by the plaintiff such as character defamation, extortion, and the possibility of entrapment are addressed in this motion for summary judgment and a new separate lawsuit, civil or otherwise, against the plaintiff is reserved for future legal action but I still expect the court to dismiss the case based on this motion.

Dated: September 29, 2017

CHARLES SECOLSKY, Ph.D., Defendant

By: Charles Secolsky

Representing Charles Secolsky

126 Rolling Meadows Road,

Middletown, New York 10940

973-489-6472

csecolsky@gmail.com

As a non-CM/ECF participant, I certify that I have mailed, with signatures required, by Express Mail of the United States Service the above-referenced set of documents constituting the motion for summary judgment to all parties listed above.

The following represents the details of the motion for summary judgment for complete dismissal of the plaintiff's lawsuit in Case 15-cv-2136 against Charles Secolsky.  These details of the motion for summary judgment are presented in close alignment with the respective complaints of the lawsuit (Numbered Items 1 -66 followed by the nine **Counts** of violation) that are alleged against defendant Charles Secolsky.  The complaints have to do with sexual harassment, assault, battery, breach of an employment contract, not coming through on obtaining

immigration visa, racial hatred, discrimination, and bigotry toward Asian women, which includes taking the plaintiff's name off a manuscript allegedly submitted to a journal, promising the plaintiff a chapter in the second edition of the defendant as co-editor's *Handbook on Measurement, Assessment, and Evaluation in Higher Education* published by Routledge, New York and not following through on that promise, and generally not doing what I said I was going to do and other miscellaneous complaints.  As the plaintiff's attorney states in the lawsuit about Secolsky referring to complaint items 1-66, all 66 of these items will be shown to lack merit to have a jury trial and based on this motion for summary judgment, we ask the court to dismiss any civil or otherwise wrongdoing against Secolsky.

*Plaintiff's numbered Complaints below are followed by Secolsky's*

## Memorandum of Support for Motion of Summary Judgment: Statement of *Comments* Material Facts Not in Dispute: *in italics*

### Introduction

1. This lawsuit arises on behalf of Hye-Young Park, a female Korean participant in a University of Illinois sponsored program, as a result of (a) actions and inactions of the defendants that allowed and emboldened Charles Secolsky to engage in acts of sexual misconduct, constitutional infringements, and other tortious behavior, and (b) retaliation by defendants against Hye-Young Park

*This is a general statement and the specifics of this motion will be addressed below for subsequent specific numbered items in the complaint.*

### Parties

2. Plaintiff, HYE-YOUNG Park, also known as Lisa Park (hereinafter "Park"), is a citizen of the Republic of Korea, is a female of Korean national origin, and was, at all times relevant to this Complaint, a non-immigrant resident of Champaign County, Illinois. Park is now a permanent resident of the United States.

3. Defendant, BOARD OF TRUSTEES OF THE UNIVERSITY OF ILLINOIS (hereinafter "University of Illinois") is a body corporate and politic which operates the University of Illinois, including the University of Illinois at Urbana-Champaign (hereinafter "UIUC"), located in Champaign County, Illinois.

4. Defendant MICHAL T. HUDSON (hereinafter "Hudson") was, at all times relevant to this Complaint, an employee of the University of Illinois, and a resident of Champaign County, Illinois.

5. Defendant HEIDI JOHNSON (hereinafter "Johnson") was, at all times relevant to this Complaint, an employee of the University of Illinois, and a resident of Champaign County, Illinois.

6. Defendant CHARLES SECOLSKY (hereinafter "Secolsky") was, at all times relevant to this Complaint, a Visiting Researcher at the University of Illinois, and a resident of Champaign County, Illinois.

7. Defendant ROBERT STAKE (hereinafter "Stake") was, at all times relevant to this Complaint, a Professor Emeritus of the University of Illinois, and a resident of Champaign County, Illinois.

2:15-cv-02136-CSB-EIL # 1 Page 2 of 45

3

8. Each of the individual Defendants listed above is sued in his or her individual capacity, and each acted under color of state law while engaging in the actions alleged in this Complaint.

*This acknowledges that the defendant has read item numbered 8 as well as 2-7.*

**Jurisdiction and Venue**

9. Jurisdiction lies under 28 U.S.C. §1331 because some of the claims of this action arise under federal law.

10. Supplemental jurisdiction over the state claims arises under 28 U.S.C. §1367(a).

11. Venue in the Central District of Illinois, Urbana Division, is appropriate under 28 U.S.C. §1391 because the occurrences complained of took place in Champaign County.


**Facts Applicable to All Counts**

12. At all times relevant to this complaint, the University of Illinois was an educational institution that received federal funding.

13. At all times relevant to this complaint, Hudson was employed at the UIUC Office of Diversity, Equality and Access (hereinafter "ODEA") with the titles of "Senior Title IX and ADA Specialist" and "Assistant ADA-EEO Coordinator."

14. At all times relevant to this complaint, Johnson was employed at the UIUC ODEA with the title of "Director."

15. From 2003 through August, 2013, Park was a graduate student at UIUC, pursuing a Doctor of Philosophy degree in the College of Education.

16. In July, 2013 Park completed the requirements for a Doctor of Philosophy degree at UIUC, and she was awarded the degree on August, 2013.

*The defendant, Charles Secolsky recognizes and accepts to the best of his knowledge the statements above made in Items 9 through 16.*

17. From October 15, 2013 through September 30, 2014, Park was legally in the United States under an F-1 non-immigrant visa as a participant in the Optional Practical Training (hereinafter "OPT") post-doctoral program sponsored by the University of Illinois.

*The defendant does not recognize item numbered 17 as a complaint as well as not absolutely certain about its validity.*

18. Prior to 1998 Stake was employed as a professor at UIUC.

19. Stake retired from UIUC in 1998, and at all times relevant to this complaint, he continued to hold an appointment at UIUC as a "Professor Emeritus."

*The defendant, Secolsky, does not dispute items 18 and 19 above.*

20. The Center for Instructional Research and Curriculum Evaluation (hereinafter "CIRCE") is a research center operating under the auspices of the University of Illinois.

*To the defendant' knowledge The Center for Instructional Research and Curriculum Evaluation was not a legal term for CIRCE as a center. Its status as a center was declined earlier and the acronym CIRCE could only be used after the University changed its status.*

21. At all times relevant to this complaint, CIRCE was housed at the Children's Research Center (hereinafter "CRC") located at 51 Gerty Drive, Champaign, Illinois.

*Defendant agrees with Item 21.*

22. At all times relevant to this complaint Stake was the Director of CIRCE.

*Defendant agrees with Item 22.*

23. Under color of his authority as Director of CIRCE, Stake:

a. granted Secolsky the authority to conduct research at UIUC under the auspices of CIRCE;

*The defendant, Charles Secolsky questions the validity of Item 23a since he was not given authorization to conduct research at UIUC, only CIRCE which had concerns beyond UIUC.*

b. granted Secolsky the authority to teach classes at UIUC;

*Defendant must clarify Item 23b of the Plaintiff's statement. Secolsky was only allowed to assist in instruction that was monitored by Professor Emeritus Stake, who was solely responsible for teaching the class, including approval of lectures for visiting students from Thailand.*

c. granted Secolsky the authority to interact with and to assist students at UIUC;

*In Item 23c, Secolsky had authority to interact with students in Stake's course as well as only authorized to assist students individually with Stake's knowing about it.*

d. provided Secolsky with office space and equipment at UIUC; and,

*In Item 23d, Secolsky was provided only a desk, which was not always the same desk and was eventually given half of one draw of a file cabinet and one shelf at most to keep his books.*

e. published on the door to office #190 at CRC, Secolsky's name along with the names of Fatima Cruz, Biljana Fredriksen, Gordon Hoke, Emily Lux, Shameem Rakha, and Bob Stake; all were listed under "circe room 188-190."

*For Item 23e, by no means was this a published sign but just a makeshift handwritten at times printed list at other times unofficial and often cardboard sign, which was not regularly kept up to date.*

24. On and after September, 2013 Secolsky held himself out as a "visiting scholar" and a "visiting professor" at CIRCE by:

*By use of the title Visiting Scholar or Visiting Researcher, Secolsky was not in anyway affiliated with UIUC but was visiting from his previous college.*

2:15-cv-02136-CSB-EIL # 1 Page 4 of 45

5

a. submitting funding proposals through CIRCE using the title "Visiting Researcher at CIRCE;"

*Two funding proposals were submitted to AERA, American Educational Research Association. CIRCE boilerplate material was used only to reference the defendant's former work with CIRCE in 1978 as a doctoral student at I Illinois and later as a volunteer in 11982.*

b. teaching classes at UIUC;

*defendant was never unsupervised and always was with official teaching assistants and closely monitored by Stake*

c. assisting UIUC students with research and writing;

*only assisted CIRCE students not UIUC students.*

d. meeting with UIUC students;

*met with CIRCE students is more accurate*

e. co-authoring scholarly papers with faculty, UIUC students, and former students;

*co-authoring scholarly papers with faculty from around the world none of which were at UIUC, nor is it accurate to say with UIUC students, former students yes.*

and,

f. utilizing a room at CRC as his office

*Yes.*

25. In addition to his affiliation with UIUC, Secolsky operated two closely-held corporations out of his residence.

*Not affiliated with UIUC..*


26. On several occasions prior to October, 2014, Stake attempted to kiss Park. Each time, Park recoiled and pulled away from Stake

*No comment.*

27. On October 14, 2014, Stake suddenly kissed Park on the lips, then abruptly left the restaurant where they had dined

*No comment.*

28. On information and belief Stake asked Secolsky to assist Park with her writing.

*False. Park asked me to consider helping her. I only consulted with Stake for help and permission after reading some of her written work.*

29. Secolsky offered to employ Park as an Operations Research Analyst for a period of

three years. Said employment would have supported Park's efforts to obtain an H1B visa.

*True, but his non-profit corporation would have paid for it if assets would allow. Furthermore, she was not legally qualified to be an Operations Research Analyst – it requires use of mathematical modeling and quantitative skills (see Attachments 1 and 2).*

30. Secolsky made numerous harassing telephone calls to Park beginning in December.

*In what year, definitely not December, 2013 because we had just started working together then.*

2013, including repeatedly telephoning her while he stood outside her apartment window.

*I called her from my car outside her apartment to let her know that I had made progress with getting te business for her visa by having just picked up the business cards at Staples in Champaign and stopped by her apartment as I was on my way back home to Savoy. But, I did call her repeatedly to no avail because she did not answer, however, her car in front of her house. I figured she was not feeling well and wanted to cheer her up by shoeing her the new business cards with her name on them.*

31. On January 24, 2014, at Secolsky's business-residence, after they had completed work on a CIRCE grant proposal:

*This is not clear. Work on the grant proposal was not finalized and there was still plenty to do on it before work on it was completed for the evening. Also, in retrospect this was not on January 24, 2014 but on January 28, 2014.*

Secolsky asked Park to watch a movie;

*Yes.*

2:15-cv-02136-EIL # 1 Page 5 of 45

6

b. When Park said that it was late and she had to leave, Secolsky said it would take just 15 minutes.

*I indicated to Park that  am putting on th movie that was in the T.V.*

c. When Park asked what the movie was about and why she should watch, Secolsky told Park that she needed to become more acquainted with "American culture."

*I only told Park t was part of American culture in June 2015 when she called me for details about the movie I had invited her to see when I was visiting New York on a vacation from Jackson, Mississippi.*

d. Park then agreed to stay for just 15 minutes.

*Short segment of time, neither of us specified the number of minutes. I claim it was six minutes.*

e. Secolsky startled Park by showing her a sexually explicit video.

*I must have startled Park.*

f. When Park questioned why Secolsky would show her such a video, Secolsky responded that "Asian women like white men."

*False, there were no Asian women in the video.*

g. When Park attempted to leave, Secolsky stood in front of the door, extended his arms and blocked her exit, telling her not to leave.

*I wanted her to accept my sincere apology for showing her the video and also asked her not to tell Stake.*

h. Secolsky grabbed Park's arm, preventing her from leaving.

*Yes, it as her hand I held for a moment asking her not to tell Stake after she ignored this request after I got on both knees pleading her not to tell.*

i. Park protested, "I'll talk to Dr. Stake" whereupon Secolsky, fell to his knees, begged Park to forgive the incident, and apologized, explaining that his mother had died early, and that he had been a foster child. Park broke away and exclaimed, "Please don't do that!"

*Yes, but only after watching with interest the part of the video near the beginning showing sexual intercourse.*

### ***NOW PLEASE SEE THE STATEMENT FROM MY SUMMARY JUDGMENT MOTION REGARDING SEXUAL HARASSNENT***

. Secolsky showed the plaintiff a short segment of an old pornographic movie entitled, *Debbie Does Dallas*. Prior to showing her the segment, the plaintiff used then n-word a number of times to refer to people of African descent including but not limited to African-Americans and also specifically referring to her African-American former doctoral advisor, Professor Violet Harris, using this foul expression because this professor was not responding to her requests for needed letters of recommendation for her job applications.

Charles Secolsky, the defendant, has a deep- rooted commitment and history among other things creating cultural inroads for a segregated black community as a teacher and administrative intern, and in completing a thesis on high school dropout prevention at an alternative school annex for minority students as a part of a thesis for a Sociology master's degree aimed at improving retention and reducing the dropout rate for students in the racially divided Jamaica, Queens, New York , where I worked with black parents and community leaders, who had been turned off to the main school building consisting of mostly white students, many of Jewish heritage. I brought a semblance of hope back to the black community regarding the education of its students where

there had been despair and racial strife in the mid-1970's. (see the attachments of the confidential letter from Professor John Seiferth of Queens College (see Attachment 4) , which was inappropriately disclosed to me by a University of Illinois faculty member; also see my c.v. (Attachment 5) from the initial disclosure file; also see letter from Shameem Rakha (Attachment 6) whose deposition was the most recent deposition taken for this lawsuit.)

The above description of my background and experience with racial issues particularly for African-American people and other people of color added considerably to my built up mood swings, high mood and extreme irritability from the the plaintiff's overuse of the n-word as well as her exhibiting other much irritating controlling behavior over me in my own place of residence, which triggered a series of behaviors on my part related to my psychiatric condition, Bipolar Disorder I. Included as Exhibits 116, 117, and 118 (Attachments 7, 8, and 9) are letters from two former psychiatrist and my current psychiatrist The Bipolar Disorder I condition is a disability and is defined as follows by the American Psychiatric Association, 2017:

Bipolar disorders are brain disorders that cause changes in a person's mood, energy and ability to function. Bipolar disorder is a category that includes three different conditions — bipolar I, bipolar II and cyclothymic disorder.

People with bipolar disorders have extreme and intense emotional states that occur at distinct times, called mood episodes. These mood episodes are categorized as manic, hypomanic or depressive. People with bipolar disorders generally have periods of normal mood as well. Bipolar disorders can be treated, and people with these illnesses can lead full and productive lives.

Symptoms of Bipolar I Disorder
Bipolar I disorder can cause dramatic mood swings. During a manic episode, people with bipolar I disorder may feel high and on top of the world, or uncomfortably irritable and "revved up." During a depressive episode they may feel sad and hopeless. There are often periods of normal moods in between these episodes. Bipolar I disorder is diagnosed when a person has a manic episode.

In exhibit 116, the psychiatric diagnosis appearing in the October 3, 2016 medical report from Dr. Stephen Krieg was Bipolar Disorder I. Exhibit 117 is a recent letter by Dr. Marc Tarle, my former psychiatrist, who also specializes in psychopharmacology reports my being hospitalized three times for extended stays for this condition.

It is uncontested that I did show her a segment of the pornography film, which is strongly indicated occurring out of my manic behavior induced from her psychological control over me, for example, repeating many times "have a seat" at the dining room table, also her use of the n-word, as well as her insistently taking advantage of my help and the help of my colleagues in translating her dissertation into a book in which she said I did not help her, although when the book was first published she thanked me and two of my colleagues in the book's acknowledgements (see Exhibit ).

In her complaint, showing the segment of the pornography film violated her civil right under Title IX. This is not true according to the 1985 ruling of the United States Court of Appeals,

Seventh Circuit, 771 F. 2d 323, Decided August 27, 1985. JUDGES: Cudahy and Easterbrook, Circuit Judges, and Swygert, Senior Circuit Judge. Swygert, Senior Circuit Judge, concurring.

The following and last set of paragraphs of the court's and concurring judge's ruling striking down the Indiana ordinance that it restricts free speech in the form of a private showing of pornography to an adult. The purported rationale on which the proposed Indiana ordinance was based was that it would reinforce presenting women in subordinately in society.

[**As quoted from the court** ruling]

The offense of forcing pornography on unwilling recipients is harder to assess. Many kinds of forcing (such as giving texts to students for translation) may themselves be protected speech. *Rowan v. Post Office,* 397 U.S. 728, 25 L. Ed. 2d 736, 90 S. Ct. 1484 (1970), shows that a state may permit people to insulate themselves from categories of speech--in Rowan sexual mail--but that the government must leave the decision about what items are forbidden in the hands of the potentially offended recipients. See *Bolger v. Youngs Drug Products Corp.,* 463 U.S. 60, 77 L. Ed. 2d 469, 103 S. Ct. 2875 (1983) (the government may not define for itself a category of constitutionally protected but sexual speech that may not be mailed). Exposure to sex is not something the government may prevent, see *Erznoznik v. City of Jacksonville,* 422 U.S. 205, 45 L. Ed. 2d 125, 95 S. Ct. 2268 (1975). We therefore could not save the offense of "forcing" by redefining "pornography" as all sexually-offensive speech or some related category. The statute needs a definition of "forcing" that removes the government from the role of censor. See also *Planned Parenthood Ass'n, supra,* holding that the "captive audience" problem does not permit a government to discriminate on account of the speaker's message.

The section creating remedies for injuries and assaults attributable to pornography also is salvageable in principle, although not by us. The First Amendment does not prohibit redress of all injuries caused by speech. Injury to reputation is redressed through the law of libel, which is constitutional subject to strict limitations. Cases such as *Brandenburg v. Ohio* and *NAACP v. Claiborne Hardware* hold that a state may not penalize speech that does not cause immediate injury. But we do not doubt that if, immediately after the Klan's rally in *Brandenburg,* a mob had burned to the ground the house of a nearby black person, that person could have recovered damages from the speaker who whipped the crowd into a frenzy. All of the Justices assumed in *Claiborne Hardware* that if the threats in Charles Evers's incendiary speech had been a little less veiled and had led directly to an assault against a person shopping in a store owned by a white merchant, the victim of the assault and even the merchant could have recovered damages from the speaker.

The law of libel has the potential to muzzle the press, which led to *New York Times v. Sullivan.* See also *Ollman v. Evans,* 242 U.S. App. D.C. 301, 750 F.2d 970, 994-98 (D.C. Cir. 1984) (en banc) (Bork, J., concurring). A law awarding damages for assaults caused by speech also has the power to muzzle the press, and again courts would place careful limits on the scope of the right. Certainly no damages could be awarded unless the harm flowed directly from the

speech and there was an element of intent on the part of the speaker, as
in *Sullivan* and *Brandenburg*.

Much speech is dangerous. Chemists whose work might help someone build a bomb, political
theorists whose papers might start political movements that lead to riots, speakers whose ideas
attract violent protesters, all these and more leave loss in their wake. Unless the remedy is very
closely confined, it could be more dangerous to speech than all the libel judgments in history.
The constitutional requirements for a valid recovery for assault caused by speech might turn out
to be too rigorous for any plaintiff to meet. [note 4] But the Indianapolis ordinance requires the
complainant to show that the attack was [334] "directly caused by specific pornography" (§ 16-
3(g)(7)), and it is not beyond the realm of possibility that a state court could construe this
limitation in a way that would make the statute constitutional. We are not authorized to prevent
the state from trying.

Again, however, the assault statute is tied to "pornography," and we cannot find a sensible way
to repair the defect without seizing power that belongs elsewhere. Indianapolis might choose to
have no ordinance if it cannot be limited to viewpoint-specific harms, or it might choose to
extend the scope to all speech, just as the law of libel applies to all speech. An attempt to repair
this ordinance would be nothing but a blind guess.

No amount of struggle with particular words and phrases in this ordinance can leave anything in
effect. The district court came to the same conclusion. Its judgment is therefore

Affirmed

SWYGERT, Senior Circuit Judge, concurring.

I concur in Parts I, II, and III of the court's opinion except for the following strictures. Although
raised in the district court, neither ripeness nor abstention was made an issue on appeal. Given
that fact, I believe both are pseudo-issues and this court need not treat them sua sponte. True,
some of the intervenors have discussed abstention in their briefs; but we are without the benefit
of the views of the real parties at interest in this case on either issue. More importantly, a
discussion and resolution of these issues are quite unnecessary to the disposition of this appeal.

I also believe that the majority's questionable and broad assertions regarding how human
behavior can be conditioned by certain teachings and beliefs (see ante, slip op. at 10-12-13) are
unnecessary. For even if this court accepts the City of Indianapolis' basic contention that
pornography does condition unfavorable responses to women, the ordinance is still
unconstitutional.

As to Part IV of the opinion, I agree that the ordinance is unconstitutional on first amendment
grounds and that there is no need to discuss vagueness or prior restraint. I do, however,
disassociate myself from the extensive statements with respect to how the Indianapolis City
Council could fashion an ordinance dealing with pornography that might pass constitutional
muster. Indianapolis has asked us to sever the ordinance and save those parts that are not
unconstitutional, if we can. All then that this court is required to do is to rule that the ordinance is

not severable. Statements regarding which portions of the ordinance may be constitutional are
merely advisory and are not the function of this court.

---

In her deposition the plaintiff, was questioned by Secolsky's former attorney for this case,
Samuel Muldavin, in the following manner and the plaintiff responded as such all about using
the n-word to refer to African-

Americans and as a result of this exchange and the following exchange regarding the plaintiff's
bossing me around in my residence triggered my acting high with mania as part of my condition.
Since we had discussed sharing the same psychiatrist, Dr. Traugot at Carle Clinic in Champaign,
Illinois before the pornography incident.

She should have exercised caution in her behavior towards me, both by her use of the n-word and
her other controlling actions.

Whereupon, Deposition Exhibit No. 42, page 370

19 BY MR. MULDAVIN:

3 Q. It's a waste of paper but what can we

4 say. The bottom is an e-mail from Dr. Secolsky to

5 you on Sunday, June the 1st, 2014. Where he says,

6 I think your referring to African Americans the

7 way you did was the thing that made me lose

8 respect for you. It made me suffer and stressed

9 out. If you are an ethnographer, why do you

10 generalize. You are a bigot and it upsets me

11 greatly. Did I read that correctly?

12 A. Yes.

13 Q. What is Dr. Secolsky talking about?

14 A. I don't know. He's talking about, like

15 out of the blue, like I am racist. I think, it

16 seems like he's saying I'm racist, even when you

17 are like ethnographer. Something like that.

18 Q. Like somebody who really shouldn't be a

19 racist?

20 A. I mean, we all racist. We are all

21 racist actually.

22 Q. Is that okay?

23 A. Yeah.

24 Q. It's okay?

25 A. Yeah, we all like, you know, racist.

1 Depending on situation.

2 Q. I understand. But, let me go back and

3 ask you this: If you can recall, was there a

4 specific incident that triggered this e-mail?

5 A. Yeah. I mean -- he brought up this

6 topic out of blue. He suffered because I

7 mentioned this one, so --

8 Q. Whoa, whoa, whoa, because you mentioned

9 what?

10 A. He said he suffered because he -- he

11 said I -- I told him that like, you know,

12 reporting African Americans the way you did, the

13 thing you made me --

14 Q. Lose respect for you, is what it says.

15 A. I read it like he's saying I'm racist,

16 so my racial comments make him sick and suffer.

17 Right?

18 Q. When he says, referring to African

19 Americans the way you did, how did you refer to

20 African Americans?

21 A. African Americans?

22 Q. Yeah.

23 A. They are people.

24 Q. No, no. In this particular e-mail.

372

1 about long time ago when we discuss about race.

2 Q. That wasn't the answer to my question.

3 A. Okay.

4 Q. My question is this: Dr. Secolsky says

5 to you, I think you are referring to African

6 Americans the way -- I think your referring to

7 African Americans the way you did was the thing
8 that made me lose respect for you.
9 A. I'm very sorry, you don't understand me.
10 (Witness reading) I don't know what he's talking
11 about at the time.
12 Q. Well, here's my question. He says I
13 think your referring to African Americans the way
14 you did was the thing that made me lose respect
15 for you. And my question is: How did you refer
16 to African Americans that got Dr. Secolsky all
17 upset?
18 A. I didn't know at the time, so I was
19 thinking about it, what did I say about African
20 Americans? So, looking back, I was thinking about
21 it, thinking about it, maybe I said that, in the
22 context we can be all racist human being.
373
2 Korean, Korean American against each other,
3 depending on context here. So, I was saying race
4 issue is more politics.
5 So, that's what I said. And I gave
6 example that I saw African -- two African peoples
7 fight each other. And one group of -- one African
8 group says nigger. And at the time they did not
9 bring up racism. So, I was talking about that.
10 Also, I talk about there are blacks,
11 some people coming from Africa, some people are
12 born here, African American. And they are talking
13 about each other like African usually -- like some
14 Africans from Africa talk about, mention African
15 Americans doing behavior like African Americans.
16 Something like this.
17 So, it's all about situation and
18 politics. I bring up that one. So, that's what I
19 think of. I didn't know because exactly what he

20 meant. But, all I can refer, maybe some time
21 maybe I was talking about race.
22 Q. Prior to Dr. Secolsky's June 1st, 2014
23 e-mail to you at 7:49 AM, did you refer to African
24 Americans as niggers in a conversation with him?
Africans are fighting each other. One group, I am
2 repeating myself right now. And one African group
3 says to the other African, nigger. At the time
4 they did not bring up racism issue. Race issue.
5 Q. Do you understand that nigger is the
6 most racist emotionally charged word in the
7 English language?
8 A. I mean, I give example.
9 Q. Even to the point that I'm kind of
10 holding my breath in saying the word because for
11 purposes of this discussion I refuse to call it
12 the "N" word.
13 A. I don't know. I don't think so. I mean
14 yellow peril, like no, we say that. Or maybe
15 like, what do you say? Redneck. Whatever.
16 People say that. I mean --
17 Q. Is that okay?
18 A. It's not okay. I gave example. I mean
19 -- the context is important. I am -- I observe
20 the fighting between African groups. And then one
21 group of people says nigger to the other group.
22 So, I --
23 Q. So, what does that mean?
24 A. I describe that one. So, at the time,
25 so racism we -- the ideology attached to race, we
375
1 breeding, we breeding the perception. We breeding
2 -- we grow up with breeding the racial ideology
3 that is embedded in the society. So we breeding,
4 and then so we kind of like observe that idea, and

5 then they do like know each other, like even
6 though they are Blacks. They say when it comes to
7 like fighting or some situation, they call
8 themselves nigger. And sometimes yellow peril or
9 something like that. That's the context here.
10 I'm not saying nigger.
11 Q. Is it only when they're fighting or is
12 it any time, if you know?
13 A. I mean -- I mean, people say something,
14 that's the example. But this is not -- this is
15 not appropriate. But, I don't know what you are
16 trying to --
17 Q. You're the ethnographer here.
18 A. Yes.
19 Q. And I'm looking at an e-mail in which
20 Dr. Secolsky, let's go even, let's take this a
21 little bit further. Where Dr. Secolsky tells you
22 that he is upset at the fact that you referred to
23 African Americans the way you did. And I'm going
24 to assume that you used that word.
376
1 A. African --
2 Q. Let's look at your response. Which is
3 right up above.
4 A. Yes.
5 Q. Let me, which is very similar to what
6 you have just said to me.
7 A. This one?
8 Q. Let me clarify about African Americans.
9 I mention the words African Americans (AA) in the
10 following context. My point is we can be all
11 racist. Sometimes which race you belong to has
12 little to do with being racist, which I wrote in
13 my dissertation. It's all about human evil
14 nature. Race is one of the ways that we human

15 beings -- one of the ways we human being to
16 manipulate human knowledge to get power.
17 I mentioned AA as an example of
18 supporting my thought in relation to my
19 observation: Which suggests to me that now this
20 is going to be your observation. There were two
21 groups of African Americans fighting each other.
22 One told the other group nigger. At this time the
23 other group did not raise racism issue. I also
24 gave you an example that Koreans talk racial
comment against Korean Americans, and vice-versa.
377
1 My impression, and correct me if I'm
2 wrong, is that Dr. Secolsky got upset because you
3 used the term nigger. And your response was, I
4 did, but I didn't.
5 A. I mentioned nigger in the context.
6 Q. Do you ever refer to African Americans
7 as niggers?
8 A. No.
9 Q. Ever?
10 A. No.
11 Q. But we're all racists?
12 A. Yeah, we can be all racists.
13 Q. Are we?
14 A. Yeah.
15 Q. Can't help it?
16 A. I mean, you can change, but I mean --
17 but it's unintentionally or without conscious or
18 sometimes like we just -- even though you don't
19 know, sometimes -- I used to be a racist too
20 before I come back to the United States. I
21 thought like Black people are poor. Like
22 unintelligent.

Another element of evidence that Secolsky was in
the middle of a manic episode was his behavior right after
showing the short segment of the pornography film as can
be seen in the following exchange by the plaintiff and Mr. Samuel
Muldavin:

I said I

14 will tell Dr. Stake. And I told you yesterday, I

15 think; he kneeled down.

16 Q. No, you told Mr. Smith.

17 A. He kneeled down. Literally he kneeled

18 down, and I was shocked at the movie. But, I was

19 also shocked at his response. Like, you know --

20 Q. And that's when he got down and begged

21 you not to tell Dr. Stake?

22 A. Yes.

23 Q. Had he turned the movie off?

24 A. I don't remember.

25 Q. Okay. What did you do after Dr.

Secolsky got on his knees and begged you not to

2 tell Dr. Stake?

3 A. I don't know. I just wanted to leave at

4 the time.

5 Q. So did you leave?

6 A. Yes. Before kneel down he did like

7 this.

8 Q. Before what?

9 A. Before he kneel down and -- he --

10 MR. LIETZ: Let's let the record show.

11 that she spread her arms wide apart.

12 A. Wide apart. Like yeah, uh-huh.

13 Q. Okay. Now, he did that before he knelt

14 down?

15 A. Yes.

*Attorney Lietz got it wrong since he thought Park was spreading out
her arms.*

In the deposition of Charles Secolsky, the defendant,in response to
many questions from M. Dennis Mickunas, the plaintiff's attorney,
Secolsky denied holding his arms out after showing the video and
before as she stated started to leave the premises, Secolsky first
wrote Dr. Park a check for the amount of what he thought was $35 dated
January 28,2014. The check was actually in the amount of $30. See
exhibit 119. This brings into question the actual date of the
pornography incident, which according to Mr.Mickunas' orginal filing
was January 29,2014 and which Dr. Park later stated for the record
that it was January 24, 2017. Since in Dr.Park's deposition being
questioned by Mr.Muldavin, she stated she gets together with Secolsky
at most two-three times a week, in all due respect, it was the check
for $30 (Attachment 10)written payable to Dr. Park at the scene right
after the pornography incident as Secolsky claimed in his deposition.

32. In numerous telephone calls Secolsky made sexually charged remarks to Park, including that they should go dancing;

*Not a sexually charged remark at all*

and,

b. that they should celebrate Valentine's Day together.

*Park sent a card to Secolsky with a big Valentine's heart on Valentine'sDay.*

33. In March 2014, in his home office, Secolsky assaulted Park with talk of sexual exploits both with his girlfriend and with a prostitute. Park ran from the office exclaiming, "I do NOT want to hear this; I do NOT want to know this, PLEASE!"

34. On several occasions, Secolsky

2:15-cv-02136-CSB-EIL # 1 Page 6 of 45

7

a. spoke to Park about "blowjobs;"

*used the word blowjobs once as we were exchanging our sex lives during a short break from our studying .She stated she had not had sex with her husband for 17 years*

spoke of *his* d of his sexual exploits;

*This occurred in January before the pornography incident. She also said in conversation that she has seen X rated Korean movies.*

c. stated that he wants children, and asked Park if she can still have children; and,

*True*

d. attempted to grope Park.

*No be specific.*

35. At all times, Park resisted Secolsky's advances, refused his requests and recoiled from his attempted groping.

*Neeeds greater specificity.*

36. In May, 2014, Secolsky related to Park that an immigration attorney named Nicolas Munday told him that marriage was the only way for Park to receive a Green Card. Secolsky told Park that she should live with him and that they should become romantically involved. Park responded "Never! Even if you give me a mountain of diamonds. I love my husband."

*Munday said this as part of his addressing Park's problem of getting a Green card.*

37. On June 2, 2014, Park contacted Stake and asked for a meeting to discuss Secolsky.

*I gues this is true.*

38. On June 5, 2014 Secolsky begged Park not to go further with her complaints, and promised her that he would take care of her visa status.

*I did promise to tr my best.*

39. On June 21, 2014, Park met with Stake at a local restaurant.

*Ii guess so.*

a. Park complained of Secolsky's sexual misconduct and said she was considering legal action.

b. Stake informed Park that:

i. Secolsky was not associated with CIRCE.

ii. Secolsky was neither employed by nor affiliated with UIUC.

iii. Secolsky was a visiting scholar.

iv. Any legal action by Park would "100% fail."

c. After a few minutes of discussion, Stake told Park that he had only five minutes remaining to meet with her.

2:15-cv-02136-CSB-EIL # 1 Page 7 of 45

8

d. Park became upset at Stake's attitude, and said that he should "just leave."

e. Stake left, saying, "Sorry I can't help."

40. On June 22, 2014 Park sent email to Stake reminding him that he had attempted to kiss her numerous times, and succeeded in kissing her on the lips on one occasion.

41. Prior to June 23, 2014, Secolsky had retained immigration attorney Susan Henner to process Park's H1B visa application.

42. June 23, 2014 attorney Susan Henner sent email to Secolsky (cc'd to Park ) in which:

a. Henner expressed confusion concerning her representation;

b. Henner expressed dismay that Secolsky had mentioned "extortion" in a telephone call to her associate;

c. Henner explained emphatically that Park is not legally permitted to pay for any of the expenses associated with the visa application; and,

d. Henner demanded that she be advised as to what was going on.

43. On June 25, 2014 Secolsky left voicemail for Park, stating he wanted to agree to terms of employment.

44. On June 25 and June 26, 2014

a. Park visited the Women's Resource Center to lodge a formal complaint regarding Secolsky's treatment of her.

b. Personnel at the Women's Resource Center referred Park to the ODEA.

c. Park visited the ODEA to lodge her complaint.

d. At the ODEA Park spoke with Hudson, and provided Hudson with evidence of her F1 OPT employment status.

2:15-cv-02136-CSB-EIL # 1 Page 8 of 45

9

e. Hudson gave Park a copy of document describing policy and procedures for addressing discrimination and harassment at UIUC, as well as a form to fill out to request "informal resolution."

45. On June 30, 2014 Secolsky sent email to attorney Susan Henner in which:

a. Secolsky promised to fulfill his promise to pay for Park's visa application.

b. Secolsky stated that Park was not extorting him.

c. Secolsky stated that both he and Park wanted only a professional relationship.

d. Secolsky stated that Park has never wanted a relationship with him, and that she loves her husband.

e. Secolsky promised to send the remaining fee to attorney Henner.

46. On July 1, 2014 Park met with Hudson. Hudson stated that ODEA would not be able to assist Park in her complaint against Secolsky because Secolsky was neither officially affiliated with, nor employed by UIUC.

47. On July 9, 2014 Park sent email to Hudson asking what further assistance ODEA might provide.

48. On July 16, 2014, Hudson sent email to Park stating, "I can certainly meet with the Department, and potentially recommend that they discontinue consulting services with/from Selcosky [sic]. Now that you have put our office on notice, I have an obligation to follow up on this matter."

49. Following Hudson's July 16, 2014 email, Park attempted unsuccessfully to meet with Hudson's supervisor.

2:15-cv-02136-CSB-EIL # 1 Page 9 of 45

10

22

50. On July 30, 2014, after continued harassment by Secolsky, Park sent email to Hudson asking, "[I]s there anything your office can do about … the issues I have raised …is there anything your office might recommend or advise[?]"

*I had not continued to harass her.*

51. On approximately August 4, 2014, ODEA personnel met with Stake concerning Park's accusations.

52. On approximately August 5, 2014, ODEA personnel met with Secolsky concerning Park's accusations.

53. On approximately August 5, 2015 Secolsky

a. informed Park that Stake was angry at having been questioned by ODEA;

b. told Park that Stake was refusing to speak to him; and,

c. told Park that he (Secolsky) was very unhappy with her complaint, stating, "I lost my reputation… I lost everything … They know everything."

54. On August 5, 2014:

a. Attorney Susan Henner sent email to Secolsky (cc'd to Park) verifying that Secolsky had withdrawn his request to pursue "premium processing" of Park's H1B visa, and that Henner should tear up the check Secolsky had sent her.

b. In a subsequent email, Henner advised that the process would "now take 3 plus months to complete" and that Park could not begin work until the case was approved.

c. Secolsky responded with email to Henner stating "Please hold offf [sic] on any processing until I speak to my attorney. **NO PROCESSING AT ALL UNTILI**

[sic] **GIVE YOU THE GREEN LIGHT**." [Emphasis in the original.]

2:15-cv-02136-CSB-EIL # 1 Page 10 of 45

11

55. On August 7, 2014:

a. Park sent email to Hudson informing her of Secolsky's retaliation.

b. Hudson responded in email, stating "I have met with Dr. Robert Stake, and my understanding is that neither you nor Mr. Secolsky have any direct employment or current affiliation with the University of Illinois."

56. On August 14, 2014, Juli Misa, Director of UIUC International Student and Scholar Services, sent email to Hudson stating:

"Lisa is currently in F-1 nonimmigrant status through the University of Illinois, Urbana-Champaign. She is authorized for one year of post-completion Optional Practical Training (OPT) based on having finished her doctoral degree here. I understand that she has been working with Professor Nancy Abelmann during her OPT, but on an unpaid basis. Unpaid activities are allowed during OPT, as long as those activities are directly related to the student's field of study."

57. On August 15, 2014, Professor Nancy Abelmann sent email to Park stating, "I am no longer willing to support your OPT because I am technically on academic leave."

58. On August 22, 2014:

a. Park met with Associate Chancellor Reginald Alston and reiterated her complaints.

b. Chancellor Alston stated that ODEA had informed him that Park was neither employed by nor affiliated with the University of Illinois.

c. Alston suggested that Park meet with Johnson.

59. On October 1, 2014 Park met with Johnson.

60. On October 21, 2014 Johnson provided Park with a one-page report of Park's complaint. The report contained a number of factual errors.

2:15-cv-02136-CSB-EIL # 1 Page 11 of 45

12

61. On October 26, 2014, Park sent email to Johnson and Associate Chancellor Menah Pratt-Clarke (cc'd to Chancellor Phyllis Wise and Associate Chancellor Reginald Alston) imploring that ODEA take some action on her complaint.

62. On October 27, 2014, Johnson emailed Park asking for additional information. Park provided the information that same day.

63. On November 18, 2014, Park met again with Johnson.

a. Park pointed out errors in the October 21 report.

b. Johnson told Park that Secolsky was neither employed by nor affiliated with UIUC, and that ODEA could do nothing for her.

c. Johnson refused to reveal the results of her investigation, citing privacy concerns.

d. Johnson asked Park what she was seeking from ODEA.

e. Park responded that she was seeking an apology, a corrected report of the incidents, compensation, and staff training at ODEA regarding the issues raised.

64. On September 16, 2014, Secolsky submitted a revision of a paper co-authored with Park, while removing Park's name as a co-author.

65. Park became upset when she discovered that she had been deleted as a co-author.

66. On November 19, 2014, Secolsky sent email to Park offering to pay her $1,300, "no tax" for his "breach of contract."

2:15-cv-02136-CSB-EIL # 1 Page 12 of 45

13

**COUNT I.**

**Battery**

**(Park v. Secolsky)**

Plaintiff, HYE-YOUNG PARK, by and through her attorney pleads this Count I against the Defendant CHARLES SECOLSKY as follows:

67. Plaintiff incorporates by reference paragraphs 1 through 66 and all sub-parts previously stated herein.

68. When on January 24, 2014, Secolsky grabbed Park's arm, he did so:

a. with intent to make physical contact of an insulting or provoking nature with Park;

*Just tagged her hand*

b. without legal justification; and,

c. without Park's consent.

69. Then and there Secolsky was guilty of having committed a battery against Park.

70. Secolsky's battery of Park:

a. was done with deliberate violence and oppression;

b. was done with complete disregard for and total indifference to the safety and well-being of Park; and,

c. was part of a pattern of ongoing and escalating misconduct.

71. Secolsky's battery of Park caused Park to suffer ongoing injury and severe emotional distress and educational harm that will continue into the future.

*Disagree with this COUNT except for holding her hand as stated in Part a.*

WHEREFORE, Plaintiff respectfully prays this Court enter Judgment in favor of Plaintiff, HYE-YOUNG PARK, and against Defendant CHARLES SECOLSKY in an amount sufficient to compensate her for her damages in excess of $50,000.00; to award her punitive

2:15-cv-02136-CSB-EIL # 1 Page 13 of 45

14

damages, attorney fees, and the costs of this action; and to grant such other relief as the Court may deem just and proper.

## COUNT II.

**Assault**

**(Park v. Secolsky)**

Plaintiff, HYE-YOUNG PARK, by and through her attorney pleads this Count II against the Defendant CHARLES SECOLSKY as follows:

72. Plaintiff incorporates by reference paragraphs 1 through 66 and all sub-parts previously stated herein.

73. From December 2013 through July 2014, Secolsky made numerous threatening advances upon Park, including exposing Park to a sexually explicit video, and making numerous abusive and threatening statements both in person and in telephone calls.

74. Secolsky's conduct placed Park in reasonable apprehension of receiving a battery.

75. Secolsky intended that his conduct place Park in reasonable apprehension of receiving a battery.

76. Secolsky's conduct was without lawful authority.

77. Then and there Secolsky was guilty of having committed assaults against Park.

78. Secolsky's assaults of Park:

a. were done with deliberate oppression;

b. were done with complete disregard for and total indifference to the safety and well-being of Park; and,

c. were part of a pattern of ongoing and escalating misconduct.

79. Secolsky's assaults against Park caused Park to suffer ongoing injury and severe emotional distress and educational harm that will continue into the future.

*Sexual harassment already explained and denied. Battery explained an denied. Assault explained and denied.*

2:15-cv-02136-CSB-EIL # 1 Page 14 of 45

15

WHEREFORE, Plaintiff respectfully prays this Court enter Judgment in favor of Plaintiff, HYE-YOUNG PARK, and against Defendant CHARLES SECOLSKY in an amount sufficient to compensate her for her damages in excess of $50,000.00; to award her punitive damages, attorney fees, and the costs of this action; and to grant such other relief as the Court may deem just and proper.

## COUNT III.

### Illinois Hate Crime, 720 ILCS 5/12-7.1

### (Park v. Secolsky)

Plaintiff, HYE-YOUNG PARK, by and through her attorney pleads this Count III against the Defendant CHARLES SECOLSKY as follows:

80. Plaintiff incorporates by reference paragraphs 1 through 66 and all sub-parts previously stated herein.

81. The Illinois Criminal Code states, in pertinent part:

"A person commits harassment by telephone when he or she uses telephone communication for any of the following purposes:

(1) Making any comment, request, suggestion or proposal which is obscene, lewd, lascivious, filthy or indecent with an intent to offend;

(2) Making a telephone call, whether or not conversation ensues, with intent to abuse, threaten or harass any person at the called number;

(3) Making or causing the telephone of another repeatedly to ring, with intent to harass any person at the called number;

(4) Making repeated telephone calls, during which conversation ensues, solely to harass any person at the called number."

720 ILCS 5/26.5-2.

82. As alleged above, Secolsky made numerous telephone calls to Park in which he made comments, requests, suggestions and proposals which were lewd and indecent with an intent to offend and harass Park.

83. As a result of said telephone calls, Secolsky committed harassment by telephone against Park.

*Park in one of these phone calls asked for $20,000 to not pursue complains. And sated in person, "Kill or Not be Killed" as a threat to me.*

2:15-cv-02136-CSB-EIL # 1 Page 15 of 45

16

84. The Illinois Criminal Code further states, in pertinent part:

"A person commits a hate crime when, by virtue of the actual or perceived … gender ... or national origin of another individual … regardless of the existence of any other motivating factor or factors, he commits assault, battery,...[or] harassment by telephone[.]" 720 ILCS 5/12-7.1(a).

85. Secolsky's harassment by telephone against Park, as well as his battery and assaults against Park, as alleged in Counts I and II above, were hate crimes in that:

a. They were motivated in whole or in part by Park's gender; and,

b. They were motivated in whole or in part by Park's national origin.

86. 720 ILCS 5/12-7.1 allows Park a private right of action against Secolsky for actual damages, including damages for emotional distress, or punitive damages, plus attorney's fees and costs.

87. Secolsky's hate crimes against Park caused Park to suffer ongoing injury and severe emotional distress and educational harm that will continue into the future.

WHEREFORE, Plaintiff respectfully prays this Court enter Judgment in favor of Plaintiff, HYE-YOUNG PARK, and against Defendant CHARLES SECOLSKY in an amount sufficient to compensate her for her damages in excess of $50,000.00; to award her punitive damages, attorney fees, and the costs of this action; and to grant such other relief as the Court may deem just and proper.

## COUNT IV.

### Illinois Gender-Related Violence, 740 ILCS 82/ *et seq.*

### (Park v. Secolsky)

Plaintiff, HYE-YOUNG PARK, by and through her attorney pleads this Count IV against the Defendant CHARLES SECOLSKY as follows:

88. Plaintiff incorporates by reference paragraphs 1 through 66 and all sub-parts previously stated herein.

2:15-cv-02136-CSB-EIL # 1 Page 16 of 45

17

89. The Illinois Gender Violence Act states, in pertinent part:

"'[G]ender-related violence', which is a form of sex discrimination, means the following:

(1) One or more acts of violence or physical aggression satisfying the elements of battery under the laws of Illinois that are committed, at least in part, on the basis of a person's sex, whether or not those acts have resulted in criminal charges, prosecution, or conviction.

…

(3) A threat of an act described in item (1) … causing a realistic apprehension that the originator of the threat will commit the act."

740 ILCS 82/5

90. Secolsky's battery and assaults against Park, as alleged in Counts I and II, constitute gender-related violence in that they were motivated in whole or in part by Park's sex.

91. 740 ILCS 82/10 allows Park a private right of action against Secolsky for actual damages, including damages for emotional distress, or punitive damages, plus attorney's fees and costs.

92. Secolsky's acts of gender-related violence against Park caused Park to suffer ongoing injury and severe emotional distress and educational harm that will continue into the future.

WHEREFORE, Plaintiff respectfully prays this Court enter Judgment in favor of Plaintiff, HYE-YOUNG PARK, and against Defendant CHARLES SECOLSKY in an amount sufficient to compensate her for her damages in excess of $50,000.00; to award her punitive damages, attorney fees, and the costs of this action; and to grant such other relief as the Court

may deem just and proper.

2:15-cv-02136-CSB-EIL # 1 Page 17 of 45

18

**COUNT V.**

**False Imprisonment**

**(Park v. Secolsky)**

Plaintiff, HYE-YOUNG PARK, by and through her attorney pleads this Count V against the Defendant CHARLES SECOLSKY as follows:

93. Plaintiff incorporates by reference paragraphs 1 through 66 and all sub-parts previously stated herein.

94. When on January 24, 2014, Secolsky stood in front of the door to his residence, extended his arms and blocked Park's exit, telling her not to leave, he intended to restrain Park.

95. Park could not freely leave Secolsky's residence because the door that Secolsky was blocking was the only exit from the residence.

96. When Park attempted to leave Secolsky's residence, and when Secolsky grabbed Park's arm, Secolsky further intended to restrain Park.

97. Secolsky's restraint of Park:

a. was not legally justified;

b. was done with deliberate violence and oppression;

c. was done with complete disregard for and total indifference to the safety and well-being of Park; and,

d. was part of a pattern of ongoing and escalating misconduct.

98. As a result of his restraint of Park, Secolsky was then and there guilty of having committed false imprisonment against Park.

99. Secolsky's false imprisonment of Park caused Park to suffer ongoing injury and severe emotional distress and educational harm that will continue into the future.

*False Imprisonment explained and denied.*

2:15-cv-02136-CSB-EIL # 1 Page 18 of 45

19

WHEREFORE, Plaintiff respectfully prays this Court enter Judgment in favor of Plaintiff, HYE-YOUNG PARK, and against Defendant CHARLES SECOLSKY in an amount sufficient to compensate her for her damages in excess of $50,000.00; to award her punitive damages, attorney fees, and the costs of this action; and to grant such other relief as the Court may deem just and proper.

## COUNT VI.

### Retaliation, 775 ILCS 5 *et seq.*

### (Park v. Secolsky)

Plaintiff, HYE-YOUNG PARK, by and through her attorney pleads this Count VI against the Defendant CHARLES SECOLSKY as follows:

100. Plaintiff incorporates by reference paragraphs 1 through 66 and all sub-parts previously stated herein.

101. The Illinois Human Rights Act states, in pertinent part:

"It is a civil rights violation for a person … to … [r]etaliate against a person because he or she has opposed that which he or she reasonably and in good faith believes to be unlawful discrimination, sexual harassment in employment or sexual harassment in elementary, secondary, and higher education, discrimination based on citizenship status in employment, because he or she has made a charge, filed a complaint, testified, assisted, or participated in an investigation, proceeding, or hearing under this Act, or because he or she has requested, attempted to request, used, or attempted to use a reasonable accommodation as allowed by this Act[.]"

775 ILCS 5/6-101(A).

102. Secolsky's misconduct included:

a. racial discrimination;

b. sexual discrimination;

c. sexual harassment; and,

d. creation of a hostile work environment.

2:15-cv-02136-CSB-EIL # 1 Page 19 of 45

20

103. Following Park's resistance to Secolsky's misconduct, and following Park's threat to "tell Dr. Stake" about the misconduct, and following Park's complaints to the ODEA about Secolsky's misconduct, Secolsky retaliated against Park by

a. interfering with Park's application for an H1B visa and permanent residency;

b. reneging on his promise to employ Park; and,

*SEE RESPONSE BELOW FOR BREACH OF CONTRACT FALSIFICATION BY PLAAINTIFF*

The Alleged Breach of the Employment Contract:

The hard clean paper copy of the employment contract between Hye-Young Park and myself, was never completed nor signed. Dr. Park, was the contract drafter in that as the employee, she met me at Chase Bank in downtown Champaign to confer with my banker Mr. Larry Brannick, now still employed with Chase Bank but in Columbus, Ohio. Larry responded to me on September 29th, 2017 after recollecting when he was at the Champaign branch working with his former colleague Brittany. Dr. Park insisted that Mr.Brannick see if he could set up direct deposit with my business checking account to pay her according to what was specified for her to receive in the unsigned employment contract that she brought for me to sign at the bank. This was six months after the pornography incident and as such I was still in fear of being reprimanded for the one pornography segment I had shown as a result of my manic behavior in response to controlling behavior and use of the n-word that occurred. On that basis, still in fear, I agreed with Mr.Brannick's suggestion, to go make a copy of the employment contract at the Urbana Free Library which happened to have a notary available. However, only a rough photocopy could be made using the coin operated photocopy machine at the library.

The attached four documents make up the employment contract, which are contained in the initial disclosure documents as are and some of its relevant pages. There are no signatures appearing on the complete contract (see Attachment). It contained many tracked changed modifications that I am claiming were made by Dr. Park. Signatures and notary stamps were made on the photocopy only; also attached is one page of the employment contract which I and Dr. Park had written on in a battle of including handwritten modifications. This page, with its handwritten modifications appeared in one of the middle pages of the contract and was modified before the entire contract was notarized (attachment with the numeral 3 at the end of the file name). Another one page file with the suffix 11 is notarized with the date August 1,2014.Finally, a fourth notarized file containing handwritten notes

dated July 8,2014 I am also attaching after having given thought about
why I never had seen the employment contract before meeting Dr. Park
at the downtown Champaign Chase bank a string of emails relating to my
original plan of action, which was for the original employment
contract with its purpose of obtaining an H1-B Visa for Dr. Park. I
was trying to help Dr. Park get an H1-B Visa through my non-profit
corporation, Resources in Education for Urban Schools, Inc.


Argument for Dismissing the Alleged Breach of Contract


By paying Dr. Park a check for $716.88 dated July 30, 2014 for the
work period July 15, 2014 - July 28, 2014, I ratified the employment
contract dated July 8, 2014. Starting with the original employment
contract which was based on the use of the approved and best suited
position title from the United States Citizenship and Immigration
Service (USCIS) recommended by my retained immigration attorney Susan
B.Henner was Operations Research Analyst. It requires mathematical
modeling and quantitative analysis for decision making, fields for
which Dr.Park had no training or capabilities for adequate
performance. Dr. Park admitted that she was only capable performing
qualitative research (see Exhibits 123 and 125 for descriptions of
Operations Research Analyst).


I do not recall going to the Urbana Free library a second time because
by paying Dr. Park $716.88 there it was not necessary to go back there
again. Unbeknownst to me Dr. Park went back to the library on her own.


 . This type of behavior was typical of Dr. Park in her desperate
efforts to get her and her son an H1-B Visa and when that was no
longer possible because of quotas, I reactivated my long dormant non-
profit business to again meet her "I won't tell" demands for a green
card for her and her son. Then, on mt landline phone she called even
though she said she would only email. In our phone conversation she
stated that her and her husband would keep the pornography incident
quiet if I came up with $20,000 for what she has gone because of me.
This blackmailing behavior on her part on a smaller scale was her
trying to obtain direct deposit for herself with my business checking
account, as will be discussed later. Another example of her bizarre
inappropriateness I saw things was in her intervening on my behalf
with the editor-in-chief of a community college journal, or in
threatening or actually contacting the editor of the *Handbook* at
Routledge, and for exaggerating in a monumental way that she organized
visiting researchers from Thailand, where she only attended lectures
on one afternoon and picked up visiting Thailand students and drove
them to Robert Stake's office. Robert Stake and I had lunch from time
to time on Neil Street. He had told me what Dr. Park was doing to
create trouble for the university and several of its departments. He
could not divulge details of what Dr. Park was doing. However, I told

him that she asked me for $20,000. He advised me very well by saying
that giving in to her blackmail was no guarantee because she might go
to court afterward anyway.

*Attachment 11*

Now please view the complete contract that Dr. Park had edited and
substituted in the position description for a qualitative researcher,
which I had to skim quickly. For the first two weeks of work or lack
of work that she would be paid as stated in paragraph 29 of the
contract, I had ratified the contract that had been notarized July 8th,
2014 with two major exceptions which were handwritten on the contract.
First, I wrote on Attachment11 that Secolsky was not responsible for
the green card. She also signed at that spot which was the only place
on that page where the notary could see our signatures and/or
initials. Second, looking at an earlier page of the employment
contract, Attachment 3, in my handwriting I wrote that employee will
be paid <u>for the work she does</u> ..whether funded or not funded by the
corporation. My handwritten additional sentence is in contrast to
paragraph 29 of the contact, which states that employee will be paid
even if work has not been given to her. My handwritten statement
created ambiguity in the contract and since the contract drafter was
Dr. Park, based om her edits on the employment contract having to do
with the roles and responsibilities of a qualitative researcher, which
she claimed in her deposition this was her and not my area of
expertise, and my stating in my deposition many times that it was not
my employment contract but her's and that I was signing under duress
still dealing with my fears and her threats of telling Stake, the
<u>university and in Exhibit 27</u> many members of the College of Education
<u>and even the Chicago Tribune</u>  about showing her the short segment of
the pornography video and how I could have done all that to her. My
main concern was feeling constantly threatened by her and her rage and
her poor work performance.

*Attachment 15*

*See also Attachments 13 and 14*

Given the situation, I fired Dr. Park under paragraph 20 of the
contract. I was able to terminate her without providing a reason.
Googling termination of employment in the State of Illinois led me to
be reassured that this was my choice and it was not necessary to do
anything official. She did no work for the two week period except
trying to obtain a green card. It's sad that she probably believed
that I still wanted to associate with her. But, after Robert Stake had
received word about the pornography incident and the diversity office
at the University of Illinois had been informed of my psychiatrically
incited inappropriateness, I no longer had any reason to have anything
to do with Dr. Park so that was my reason for not notifying her about
anything.

c. removing Park's name as co-author of a scholarly paper

*She contributed next to nothing and was relegated as a mention in a footnote. The manuscript was resubmitted anyway. She contacted the Executive editor-in-chief on her own to complain. See Attachment 11..*

104. 775 ILCS 5/10-102 allows Park a private right of action against Secolsky for actual damages, including damages for emotional distress, or punitive damages, plus attorney's fees and costs.

105. Secolsky's retaliation against Park caused Park to suffer ongoing injury and severe emotional distress and educational harm that will continue into the future.

WHEREFORE, Plaintiff respectfully prays this Court enter Judgment in favor of Plaintiff, HYE-YOUNG PARK, and against Defendant CHARLES SECOLSKY in an amount sufficient to compensate her for her damages in excess of $50,000.00; to award her punitive damages, attorney fees, and the costs of this action; and to grant such other relief as the Court may deem just and proper.

## COUNT VII.

### Retaliatory Discharge, 42 U.S.C. § 1981

### (Park v. Secolsky)

Plaintiff, HYE-YOUNG PARK, by and through her attorney pleads this Count VII against the Defendant CHARLES SECOLSKY as follows:

106. Plaintiff incorporates by reference paragraphs 1 through 66 and all sub-parts previously stated herein.

2:15-cv-02136-CSB-EIL # 1 Page 20 of 45

21

107. Secolsky's comments to Park about white men and Asian women constituted racial discrimination. (See attachment 12).

*She always said "I like white" and even did so at our joint presentation at a CREA*

108. The United States Code states, in pertinent part,

"All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts …, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens[.]" 42

U.S.C. § 1981.

109. Secolsky's offer to employ Park for a period of three years and to assist in securing an H1B visa for her was a contract, or a would-be contract.

110. Park's complaints about racial discrimination made to Stake and to the ODEA were protected activities under 42 U.S.C. § 1981.

111. Secolsky's interference with the processing of Park's visa application constituted retaliatory discharge.

112. Secolsky's failure to hire Park as promised constituted retaliatory discharge.

113. Secolsky's retaliatory discharge was motivated, at least in part, by Park's complaint about racial discrimination.

114. Secolsky's retaliatory discharge was committed with deliberate oppression and with wanton disregard of the rights of Park, because without employment and a work visa, Park would be unable to remain and work legally in the United States

115. 42 U.S.C. §1981 allows Park a private right of action against Secolsky for damages.

42 U.S.C. §1981a(b) and 42 U.S.C. §1988 identify damages, punitive damages, court costs, litigation expenses and attorney's fees as within the remedies available in an action brought pursuant to 42 U.S.C. §1981.

2:15-cv-02136-CSB-EIL # 1 Page 21 of 45

22

116. Secolsky's retaliation against Park caused Park to suffer ongoing injury and severe emotional distress and educational harm that will continue into the future.

WHEREFORE, Plaintiff respectfully prays this Court enter Judgment in favor of Plaintiff, HYE-YOUNG PARK, and against Defendant CHARLES SECOLSKY, to award her compensatory damages of $1,000,000.00, punitive damages of $5,000,000.00, attorney fees, and the costs of this action; and to grant such other relief as the Court may deem just and proper.

## COUNT VIII.

### Intentional Infliction of Emotional Distress

### (Park v. Secolsky)

Plaintiff, HYE-YOUNG PARK, by and through her attorney pleads this Count VIII against the Defendant CHARLES SECOLSKY as follows:

117. Plaintiff incorporates by reference paragraphs 1 through 66 and all sub-parts previously stated herein.

118. After January 2014, Secolsky committed the following extreme and outrageous acts against Park:

a. Secolsky committed numerous hate crimes against Park, as alleged in Count III.

b. Secolsky retaliated against Park by deleting her name as coauthor of a scholarly paper, depriving Park of recognition for her academic contributions.

*Already explained and denied*

c. Secolsky retaliated against Park by reneging on his promise to assist Park in obtaining an H1B visa and permanent visa.

*Already explained and denied See attachments related to employment contract 13 16 plus detailed explanation about doctoring of said contract explained previously in section on breach of contract and as appearing in initial disclosures.*

119. Secolsky's acts were done willfully, maliciously, outrageously, deliberately and purposefully with intention and the result was the infliction of severe emotional distress upon Park.

23

120. Secolsky's acts were carried out with reckless disregard of and indifference to the high probability of causing Park severe emotional distress.

121. Secolsky's acts did, in fact, result in severe emotional distress to Hye-Young Park.

122. Secolsky's misconduct shocks the conscience.

123. As a direct and proximate result of Secolsky's acts, Park was caused to suffer severe bodily injury and extreme emotional distress, including: fright, anguish, shock, nervousness, anxiety, feelings of guilt, sleeplessness, nightmares, depression, loss of trust, inability to concentrate, difficulty studying, loss of appetite, headaches and stomach aches, all of which will continue into the future, as well as educational harm.

124. The nature of suffering incurred by Park is ongoing, and will continue into the future.

125. Park's extreme emotional distress required psychiatric and therapeutic treatment, and will continue to require psychiatric and therapeutic treatment into the future.

WHEREFORE, Plaintiff respectfully prays this Court enter Judgment in favor of Plaintiff, HYE-YOUNG PARK, and against Defendant CHARLES SECOLSKY in an amount sufficient to compensate her for her damages in excess of $50,000.00; to award her attorney fees, and the costs of this action; and to grant such other relief as the Court may deem just and proper.

## COUNT IX.

### Denial of Substantive Due Process, 42 U.S.C. § 1983

### (Park v. Secolsky)

Plaintiff, HYE-YOUNG PARK, by and through her attorney pleads this Count IX against the Defendant CHARLES SECOLSKY as follows:

126. Plaintiff incorporates by reference paragraphs 1 through 66 and all sub-parts previously stated herein.

127. The United States Code states, in pertinent part:

24

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress[.]" 42 U.S.C. § 1983.

128. At all times relevant to this complaint, Stake was cloaked with the authority of state law because:

a. The University of Illinois delegated to Secolsky the authority to supervise students, to teach classes, to co-author scholarly papers, and to submit funding proposals under the auspices of the University of Illinois

*.Not true*

b. Secolsky and Stake jointly taught classes at the University of Illinois to such an extent that Secolsky's actions were attributable to Stake and the University of Illinois.

*Not true.*

c. The University of Illinois created the legal framework through which Secolsky was able to supervise students, teach classes, co-author scholarly papers, and submit funding proposals

d. Secolsky, through teaching, supervising students, co-authoring scholarly papers, and submitting funding proposals, was carrying out the traditional state functions of the University of Illinois.

e. Through the aforementioned actions, the University of Illinois created a special relationship with Secolsky.

129. Secolsky's comments about Asian women and white men subjected Park to discrimination in her education based on race or national origin.

2:15-cv-02136-CSB-EIL # 1 Page 24 of 45

25

130. Secolsky's sexual harassment of Park subjected her to discrimination in her education based on gender.

*Already explained as dismissible.*

131. Secolsky's racial discrimination, sexual discrimination, and sexual harassment of Park created a hostile work environment for Park.

*Not true.*

132. Secolsky's racial discrimination, sexual discrimination, and sexual harassment of Park were intentional.

133. Secolsky's racial discrimination, sexual discrimination, and sexual harassment of Park deprived Park of her constitutional right to Equal Protection under the Fourteenth Amendment.

134. 42 U.S.C. §1983 allows Park a private right of action against Secolsky. 42 U.S.C. §1988 identifies damages, court costs, litigation expenses and attorney's fees as within the remedies available in an action brought pursuant to 42 U.S.C. §1983.

135. Secolsky's denial of Park's Fourteenth Amendment right to Equal Protection caused Park to suffer bodily harm, severe emotional distress and educational harm, all injuries of which have continued to the present date and will continue for decades into the future.

WHEREFORE, Plaintiff respectfully pray this Court enter Judgment in favor of Plaintiff, HYE-YOUNG PARK, and against Defendant CHARLES SECOLSKY, to award her compensatory damages of $1,000,000.00, punitive damages of $5,000,000.00, attorney fees, and the costs of this action; and to grant such other relief as this Court deems just and proper.

2:15-cv-02136-CSB-EIL # 1 Page 25 of 45

26

WHEREFORE, Plaintiff respectfully pray this Court enter Judgment in favor of Plaintiff, HYE-YOUNG PARK, and against Defendant CHARLES SECOLSKY, to award her compensatory damages of $1,000,000.00, punitive damages of $5,000,000.00, attorney fees, and the costs of this action; and to grant such other relief as this Court deems just and proper.

ADDITIONAL ITEM OF INTEREST TO THE CASE:

~~Excerpt from Dr. Park's Medical Record from Dated March 25, 2014 printed by Joanna Gebauer in initial disclosure files. see attached.~~

In this confidential medical report dated March 25, 2014 and in medical records prior to that time (2012 and 2013), Dr. Park self-reported that her marital status is Single even though in her deposition she reflected back in time and reported that she was married to her husband who was in Seoul, South Korea. He contributed substantially to her support while in Champaign, Illinois. Why wasn't she honest with me? Was she trying to play games in her pursuit of me?

Charles Secolsky, Ph.D

Date: _____

_____
Original Signature:
_____