## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## URBANA DIVISION

| | |
|---|---|
| HYE-YOUNG PARK, a/k/a LISA PARK,    ) | |
|                             ) | |
|        Plaintiff,       ) | |
| v.                        ) | **Case No. 15-CV-2136** |

**HYE-YOUNG PARK, a/k/a LISA PARK,**

       **Plaintiff,**

  **v.**                       **Case No. 15-CV-2136**

**MICHAL T. HUDSON, individually**
**HEIDI JOHNSON, individually,**
**CHARLES SECOLSKY, individually,**
**ROBERT STAKE, individually, and**
**THE BOARD OF TRUSTEES OF THE**
**UNIVERSITY OF ILLINOIS,**

       **Defendants.**

## ORDER

    Plaintiff, Hye-Young "Lisa" Park, filed her Partial Motion for Summary Judgment (#124) on October 2, 2017. Defendants Board of Trustees of the University of Illinois, Michal T. Hudson, and Heidi Johnson filed their Motion for Summary Judgment (#125) the same day, followed by Defendant Robert Stake's own Motion for Summary Judgment (#126). *Pro se* Defendant Charles Secolsky filed his Motion for Summary Judgment (#132) on October 3, 2017. Responses and replies were filed, with the motion becoming fully briefed on November 8, 2017.

## BACKGROUND

    Before discussing the background, it should be noted, however, that Defendant Secolsky's motion and response to Plaintiff's motion failed to comply with the local rules. Plaintiff has moved to strike the motion in its entirety. The court will not do that. However, it will not consider factual assertions, made by Secolsky in response to Plaintiff's facts, that are not in compliance with the local rules. Secolsky does not

appear to have presented his own undisputed material facts, but rather recited the facts

from Plaintiff's partial motion with commentary on some of the facts.  In any event, if

Secolsky meant to dispute those facts, "each claim of disputed fact must be supported

by evidentiary documentation referenced by specific page."  Central District of Illinois

Local Rule 7.1(D)(2)(b)(2).  Further, Secolsky's motion itself is a disjointed mess.  Some

pages are entirely reprinted case law, while others are page upon page of transcripts.

Secolsky also reprinted Plaintiff's amended complaint, inserting commentary here and

there.

Secolsky is proceeding *pro se*, and this court has, up to this point, treated him

with the leniency usually accorded to *pro se* parties in federal court.  *Pearle Vision, Inc. v.
Romm*, 541 F.3d 751, 758 (7th Cir. 2008).  However, it is also well established that *pro se*

litigants are not excused from compliance with procedural rules.  *Pearle Vision*, 541 F.3d

at 758.  Even *pro se* parties must comply with local rules in the absence of good cause.

*Garcia v. Illinois State Police*, 545 F.Supp.2d 823, 836 (C.D. Ill. 2015).  The court finds

instructive the reasoning of this court's predecessor:

> Further, *pro se* litigants are presumed to have full knowledge of applicable
> court rules and procedures. Therefore, although the plaintiff is proceeding
> *pro se*, he must follow the Federal Rules and procedural rules of the
> Central District of Illinois. See *Metro Life Ins. Co. v. Johnson*, 297 F.3d 558,
> 562 (7th Cir. 2002). The defendants are correct. Local rules serve an
> important function in the summary judgment process. "Such rules assist
> the court by organizing the evidence, identifying undisputed facts, and
> demonstrating precisely how each side proposed to prove a disputed fact
> with admissible evidence." *Bordelon v. Chicago Sch. Reform Bd. Of Trustees*,
> 233 F.3d 524, 527, (7th Cir. 2000), citing *Markham v. White*, 172 F.3d 486, 490
> (7th Cir. 1999). The Seventh Circuit has consistently and repeatedly
> upheld a district court's discretion to require strict compliance with its
> local rules governing summary judgment." *Bordelon*, 233 F.3d at 527
> (upholding the district court's decision to strike response in its entirety

2

rather than selectively due to failure to comply with local rules); *Midwest Imports, Ltd. v. Coval*, 71 F.3d 1311, 1316 (7th Cir. 1995); *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 922 (7th Cir. 1994)(collecting cases).

*Moralis v. Flageole*, 2007 WL 2893652, at *3 (C.D. Ill. Sept. 28, 2007).

Therefore, the court will try and decipher Secolsky's arguments the best it can in considering his motion, but arguments that are found to be unsupported or unintelligible will not be considered.

The following background facts are taken from the Undisputed Statement of Material Facts and Additional Facts contained in the parties' various motions and responses.

*Park and Stake*

Plaintiff, originally from South Korea, transferred to the University of Illinois in 2003 or 2004 to continue her doctoral studies.  She eventually graduated with a Ph.D. in August 2013.  Plaintiff remained in this country after graduation due to her participation in the Optional Practical Training program (OPT).  OPT is temporary employment that is directly related to an F-1 visa student's major area of study.  Eligible students can apply to receive up to twelve months of OPT employment authorization before completing their academic studies and/or after completing their studies.  After she graduated, Plaintiff, a Korean citizen, did unpaid OPT with Dr. Nancy Abelmann and Dr. Violet Harris of the University of Illinois.  Through OPT, Plaintiff's immigration status continued to be in good standing for an additional year after graduation, through September 30, 2014.  Following that time, Plaintiff could legally stay in the United States

until November 30, 2014, as there was a two month grace period after the conclusion of her OPT.

Dr. Robert Stake is a professor emeritus at the University of Illinois, with a Ph.D. in psychology, who taught at the University of Illinois from 1963 until his retirement in 1998, after which he became a Professor Emeritus.  Plaintiff first met Stake while she was a graduate student at Illinois.  In Spring 2005 Plaintiff was a student in Stake's EDPSY 490E course.  Between 2005 and 2012, Plaintiff and Stake interacted with each other for the purpose of assisting and advising Plaintiff in her quest to obtain her doctorate.

After graduation in August 2013, Plaintiff traveled to South Korea for a month or so, and then returned to the United States in mid October.  After her return, she applied for a number of positions at different universities, including Michigan State, Purdue, Harvard, Michigan, and Texas.  After her return, Plaintiff attended, without enrolling, a class taught by Stake.  Plaintiff looked to Stake as someone who could serve as a mentor, help her with her job search at other universities, and potentially serve as a reference.

On October 14, 2013, Plaintiff went to lunch at Kamakura Restaurant in Champaign with Stake.  Plaintiff wanted Stake's assistance with her applications to various universities, and, specifically, help putting together materials such as a syllabus for those applications.  At the lunch, Stake informed Plaintiff that he needed to be somewhere else at 1:00 pm.  While still within the restaurant, Plaintiff claims Stake

4

kissed her on the lips, while Stake claims he kissed Plaintiff on the forehead.  Plaintiff stated that the kiss lasted a very short time.  Plaintiff did not ask Stake to kiss her, and Stake admitted that he kissed Plaintiff "spontaneously, thoughtlessly."  After kissing Plaintiff, Stake and Plaintiff stared at each other in silence for thirty to sixty seconds, and Stake then quickly left, with neither person saying anything to the other.  Plaintiff testified that she was "disgusted" by the kiss, and went to the bathroom to "wipe up" and "rinse it all over."   Since October 14, 2013, Stake has not kissed, inappropriately touched, or otherwise harassed Plaintiff in any way.  In the weeks following the kiss, Stake continued to provide Plaintiff help with applications for employment to various schools.

*Park and Secolsky*

Defendant Charles Secolsky was a visiting researcher at the Center for Institutional Research and Curriculum Evaluation (CIRCE) at the University of Illinois from 2012 to 2014. Secolsky was not employed by, nor did he have an appointment with, the University of Illinois at all times relative to this case.  Plaintiff, however, claims that Secolsky was employed as, or at least held himself out as, an instructor. Defendant Robert Stake taught "Case Study Methods" classes at the University of Illinois in 2013 and 2014.  Stake invited Secolsky to attend his case study class at that time.  Stake listed himself and Secolsky as the instructors in the EPSY 490E (Case Study Methods) class for 2014.  Stake further admits that Secolsky "substituted for" Stake in Stake's case study class, that he had Secolsky "take over, coordinating, helping" others,

5

and that Secolsky "did present a topic from [Stake's] syllabus" in place of Stake.  Stake also allowed Secolsky to use files, books, and a desk in an office in the Children's Research Center.  While visiting CIRCE, Secolsky engaged in grant writing, teaching case study methods and program evaluation, paper presentations, lectures on survey research methodology, accreditation, evolution of validity, computerized adaptive testing, and Bayesian statistics in mixed method research.  Secolsky also advised and mentored doctoral students in Stake's case study classes.  Secolsky coordinated a visit by Thai students in the Spring of 2014.  Stake also suggested that Secolsky use the title "Professor, visiting CIRCE, Illinois," on a grant proposal, because it made Stake more comfortable.  Stake stated it was because he did not want Secolsky giving the impression of an association with the University that did not exist.

Initial Park-Secolsky Interactions

Plaintiff first met Secolsky in the fall of 2013, after her return from South Korea.  Secolsky and Plaintiff developed what she referred to as an academic relationship.  At the time, Plaintiff was working on writing a book.  She sent Secolsky sections of her book for review.  They also collaborated on academic matters. Plaintiff worked with Secolsky on grant proposals, a conference paper to the Center for Culturally Responsive Evaluation and Assessment (CREA) at the University, and the Thailand Seminar Series at the University.  Towards the end of 2013, Secolsky asked Plaintiff to pick him up at the airport in Savoy, Illinois, which Plaintiff considered to be inappropriate.  Other than the request for a ride from the airport, between first meeting Secolsky in late 2013 and

6

January 24, 2014, Plaintiff does not allege any inappropriate behavior on the part of Secolsky.

<u>January 24, 2014 Incident</u>

On January 24, 2014, Plaintiff and Secolsky were working together at Secolsky's residence.  After their work was completed, Secolsky displayed a portion of a sexually explicit video (entitled "Debbie Does Dallas") to Plaintiff.  The video showed conventional male-female intercourse, female-male fellatio, and a male "feeling up" a female.  Secolsky described his behavior during this video incident as "manic," stating that he had a hypomanic episode in-line with bipolar disorder at the beginning of the incident, turning into more manic behavior by the end of the incident.  Secolsky admits that while showing Plaintiff the video, he felt anger.  Plaintiff asserts that Secolsky told her the video would teach her about "American culture," and Secolsky admits that, as part of his "manic episode," he "might have" said that Plaintiff needed to learn about "American culture." Plaintiff was stunned and shocked by the video.  When asked if he expected to shock Plaintiff, Secolsky responded that he "really didn't care" and that he was "really extremely angry at her."  Secolsky claims his anger stemmed from Plaintiff's repeated use of the "n-word" and controlling behavior.  Plaintiff told Secolsky that she did not want to see any more of the video and attempted to leave. When Plaintiff attempted to leave, Secolsky got on his knees and begged "please forgive me...please don't tell Bob Stake."  Secolsky described Plaintiff as being upset.  Plaintiff asserts that Secolsky spread his arms, blocking her from exiting his apartment.

Questioned about Plaintiff's claims that he blocked her exit, Secolsky testified that he "doesn't know" if he did so, and that he "didn't think" that he was blocking her exit, but that he wanted to tell her "say it [please don't tell Bob Stake] one more time before she left." Plaintiff asserts that as she tried to leave, Secolsky touched her shoulder. Secolsky denies touching Plaintiff's shoulder, but stated that he did "hold her hand for momentarily." Asked whether he positioned himself between Plaintiff and the door, Secolsky responded "Just opening the door one more time, please don't tell Bob Stake."

Plaintiff did not report the January 24, 2014 incident to anyone (besides her psychiatrist) until June 2014, when she told her friend Shameem Rakha, who knew both Stake and Secolsky, about the problems she was having with Secolsky. After the January 2014 video incident, Secolsky apologized and Plaintiff continued to exchange drafts of her writing with him, and she also continued to work with Secolsky on "conference presentations and grant proposals." Between January 24, 2014 and February 14, 2014, Secolsky did not do anything Plaintiff perceived to be inappropriate. Plaintiff also stated Secolsky said that "Asian women like whites," but she could not remember when exactly the comments were made and in what context they were made. Sometime in early 2014 Secolsky offered Plaintiff a job as a qualitative researcher, which she accepted.

On March 8, 2014, Plaintiff and Secolsky were working at his apartment. After a couple of hours of work, Secolsky brought up his sexual and dating life, which Plaintiff considered to be inappropriate. Secolsky admits that, on one occasion, he told Plaintiff

8

about how his girlfriend in New Jersey liked "blowjobs" and "mutual oral sex." Plaintiff cannot recall when, but on multiple occasions, Secolsky pointed at his cheek and asked Plaintiff to kiss it. Secolsky admitted to asking Plaintiff to do this on at least one occasion. When asked about an email dated July 20, 2014, in which Plaintiff asked Secolsky to use email rather than "calling nine times on Sunday," Secolsky stated that "I could have called her nine times about, somewhere near nine times that day, the whole day." When asked about an email dated July 9, 2014, in which Plaintiff complained to Secolsky about "many calls and messages that are not employment related[,]" Secolsky stated "I'm aware of what she's talking about. She's asking me before that, in request for the nine times, she is saying please use e-mail. And I guess one of my reactions is, I don't like emails with her. I'd rather [use] phone calls, and I'm the boss." When asked about repeated telephone calls made to Plaintiff, Secolsky stated that "I only did that once or twice." Secolsky did admit to standing outside Plaintiff's apartment window and calling out to her. He asserted that he was trying to deliver Plaintiff's business cards to her, and that this possibly occurred the day before he made the repeated phone calls on July 20, 2014.

Secolsky knew that Plaintiff was undergoing psychiatric counseling, and might be suicidal. Secolsky requested Plaintiff perform menial tasks, such as fetching medication from a pharmacy and cleaning his apartment. He requested that Plaintiff perform these tasks because he "was angry" and "annoyed" and felt "abused and used," so he figured he would "fight back."

<u>Plaintiff's Employment With Secolsky</u>

By March 17, 2014, Plaintiff and Secolsky agreed that Secolsky would file a petition for an H1B visa to hire Plaintiff through his company.  Plaintiff entered into an employment contract with Secolsky in the summer of 2014. Plaintiff was named an employee of Secolsky's company, Resources in Education for Urban Schools, Inc.  On July 8, 2014, Plaintiff sent Secolsky a draft employment contract between herself and Secolsky's company.  On July 14, 2014, she signed a two-year employment contract to work for Secolsky's company.  Her job officially started on or about July 15, 2014, however she would do work for Secolsky in the winter and spring of 2014.   Secolsky promised to sponsor and pay for an H1B visa application for Plaintiff, and Secolsky did indeed apply for an H1B visa.

At the time she started working for him, she continued to have trouble getting her visa situation sorted out through Secolsky's company.  On July 31, 2014, Secolsky emailed a H1B visa petition to Susan Henner and Plaintiff.  The petition, if approved by the government, would have allowed Plaintiff to stay in the country legally and work for Secolsky's company.  Secolsky, in what he claims was an honest mistake, mishandled Plaintiff's initial visa application.  Secolsky and Plaintiff agreed to apply for a visa through Secolsky's non-profit, which did not have the same deadline restrictions.

Secolsky eventually stopped the processing of Plaintiff's H1B visa because he felt Plaintiff was blackmailing him, in that Plaintiff kept upping her demands, such as asking for a green card for herself and then her son.  The last time Plaintiff and Secolsky

10

met in person was August 8, 2014, although Plaintiff continued to work for his company in the week after.  Secolsky eventually decided not to further employ Plaintiff, and decided against pursuing her immigration case.  Under her OPT status, Plaintiff could only stay in the United States until November 30, 2014.  Secolsky departed from Champaign-Urbana in November 2014.

<u>Plaintiff and ODEA</u>

On June 3, 2014, Plaintiff met with Shameem Rakha to discuss her issues with Secolsky.  During the conversation, Plaintiff told Rakha about the January 2014 sexually explicit video incident, the March 2014 conversation where Secolsky brought up his sex and dating life, that Secolsky had not completed the visa application as agreed upon, and that he came to her apartment unannounced and made phone calls, sometimes while outside her apartment, that did not have anything to do with academics.

Plaintiff, at her request, met with Robert Stake on June 21, 2014, to complain about Secolsky's behavior.  Plaintiff told Stake about Secolsky's conduct and his failures to take her visa situation seriously.  Stake met with Plaintiff for approximately ten to fifteen minutes, and explained to Plaintiff that Secolsky was not employed by or affiliated with the University of Illinois.

After meeting with both Stake and Rakha, Plaintiff continued to pursue employment and a visa through Secolsky, ultimately entering into the July 2014 employment contract with Secolsky's company.

On June 24 or 25, 2014, Plaintiff went to the Women's Resource Center (WRC) at

the University to report Secolsky's alleged harassment, his failure to keep his promises with respect to her visa situation, and his unwanted telephone calls and visits. The WRC referred Plaintiff to the Office of Diversity, Equity, and Access (ODEA). On June 25, 2014, Plaintiff went to the ODEA office and completed an inquiry intake form. On the form, Plaintiff described her situation as follows: "I discussed my issue with Rachel from WRC. Sexual harassment/racial discrimination/lies, distortion, & manipulation, slander[.] Seeking for the best way of getting through my situation and asking for advice (e.g. possible options that can be taken)."

Defendant Michal T. Hudson works for ODEA. Hudson asked ODEA staff to search the University's BANNER system to determine whether the persons identified in Plaintiff's intake form were students or employees of the University. On June 26, 2014, Plaintiff met with Hudson at the ODEA office, where she informed Hudson of her OPT status. Hudson took notes of their conversation, but testified that she did not think she had been aware of the OPT program. On June 27, 2014, Plaintiff sent an email to Stake with carbon copies to Secolsky, Shameem Rakha, and Hudson. Hudson immediately responded to the email suggesting that Plaintiff refrain from copying Secolsky on any further emails until ODEA could assess the issues Plaintiff discussed with Hudson a few days before. On that same day, Plaintiff asked Hudson, via email: "So, you advise me not to send directly, cc, or respond to Chuck's email? I am more than willing to follow your advice and directions." Hudson responded "Yes. Your clarification is correct. Please allow me the opportunity to review all of the information you have

12

provided before you resume communication with Charles Secolsky."  Plaintiff claims

that she needed to continue working with Secolsky to secure her visa, and thus entered

into the employment contract with him days later.

Plaintiff does not recall any specific incident of harassment between June 25 and

July 1, 2014.  Plaintiff had another meeting with Hudson on July 1, 2014, where she

advised Hudson that she had agreed to be hired by Secolsky the day before, and did not

want Hudson to take any further action.  Plaintiff did not want Hudson to take any

further action because she did not want to endanger her chances of getting a visa

through Secolsky, whom she felt was her only chance of securing such a visa.  She also

remembered Hudson telling her that ODEA would not be able to assist her in her issues

with Secolsky because Secolsky was not officially affiliated with the University.

Between July 1 and 9, 2014, Plaintiff does not recall any specific instances of

harassment from Secolsky.  On July 9, 2014, Plaintiff sent Hudson an email with a series

of questions.  On July 14, 2014, Plaintiff signed the employment contract with Secolsky.

On July 16, 2014, Hudson responded to Plaintiff's July 9 inquiries.  Plaintiff first asked

for clarification on whether ODEA could not assist her because it believed that Secolsky

was not affiliated with the University.  Hudson responded that, in these types of cases,

they contact the respondent (in this case, Secolsky) to meet with the ODEA, but that it

could not happen in Plaintiff's case because, the best ODEA could tell, Secolsky was not

affiliated with the University and thus would not be required to meet with ODEA.

Plaintiff next asked if there was any assistance available from ODEA, to which Hudson

responded that she could meet with the Department, and potentially recommend they discontinue consulting services with Secolsky.  Plaintiff then asked if she could meet again with Hudson, and Hudson responded that her assistant would check her availability for a mutually agreed upon time for a thirty minute meeting.

On July 16, 2014, Plaintiff replied to Hudson's email, stating: "So basically, your office cannot do anything other than 'meeting with the Department, and potentially recommend that they discontinue consulting services with/from Secolsky,' right? If that is the case, I do not want to pursue a meeting with you, nor ask your office for a further reaction in this matter."  Hudson responded that day, noting she was saddened if Plaintiff was not satisfied with the answers she provided, but stating that "[n]evertheless, I still have an obligation as it relates to inappropriate conduct on this campus."

Plaintiff does not remember any specific instances of harassment from Secolsky between July 1 and 16, 2014, but she did have trouble getting her visa situation sorted out through Secolsky's company during this period.  On July 30, 2014, she sent an email to Hudson stating that she now knew much more about how to cope with Secolsky, "although my psychiatrist advised me to continue to take medication today."  Plaintiff also asked if there was anything ODEA could do to address the "difficulties" she had gone through, or that ODEA could recommend or advise her on.  Plaintiff closed by stating "I think my issue is related to the negligence of the University of Illinois."

On August 4, 2014, Hudson met with Stake to investigate the allegations raised

14

by Plaintiff.  Stake and Hudson discussed Secolsky and Plaintiff, and Stake was asked if he had kissed Plaintiff.  Stake told Hudson he had no recollection of that.  On August 5, 2014, Secolsky voluntarily came to ODEA's office and met with Hudson.  Secolsky admitted showing an inappropriate video to Plaintiff in January 2014, but denied kissing, touching, or otherwise harassing Plaintiff.

Between July 1 and August 2, 2014, Secolsky did not do anything to Plaintiff that she considered to be sexual harassment, but he did do things Plaintiff considered to be a form of harassment, such as calling her multiple times to run errands, getting things from the pharmacy, asking her to clean his apartment, and leaving messages with no content.  However, Plaintiff did not report any of those events to ODEA.  Since August 2, 2014, Secolsky had not harassed Plaintiff in any way.

On August 7, 2014, Hudson sent Park an email stating that she (Hudson) had met with Stake, and it was her "understanding that neither you nor Mr. Secolsky have any direct employment or current affiliation with the University of Illinois.  If you have information to the contrary, please let me know."  The next day Plaintiff emailed Hudson asking a series of clarifying questions regarding Hudson's August 7 email.  On August 13, 2014, Plaintiff sent a follow up email and asked additional clarifying questions.  That day Hudson responded, stating, in part, that neither Plaintiff nor Secolsky were employed or currently affiliated with the University, and the onus was on Plaintiff to demonstrate otherwise.  Therefore, unless Plaintiff could demonstrate that the inappropriate behavior occurred while Plaintiff was either an employee or

15

affiliated with the University, ODEA did not have jurisdiction over the matter.  Plaintiff,

again that same day, twice responded to Hudson's email asking additional questions

and outlining information that she had gathered regarding Stake, Secolsky, and OPT

status.  She did the same on August 19, 2014.

Plaintiff's "I-20," issued by the University, states that Plaintiff was a "student

employee" from October 1, 2013 to September 30, 2014, and that she was employed by

the University as a researcher.  On August 14, 2014, Julie Misa sent an email to Hudson

explaining Plaintiff's OPT status as follows:

> Lisa is currently in F-1 nonimmigrant status through the University of
> Illinois, Urbana-Champaign.  She is authorized for one year of post-
> completion Optional Practical Training (OPT) based on having finished
> her doctoral degree here.  I understand that she has been working with
> Professor Nancy Abelmann during her OPT, but on an unpaid basis.
> Unpaid activities are allowed during OPT, as long as those activities are
> directly related to the student's field of study.

On August 13, 2014, Kelley Frazier, assistant to Dr. Nancy Abelmann, sent an

email to Abelmann which stated as follows: "Attached is the letter for Lisa Park for her

visa status.  Her current visa expires on September 30, 2014 so I think she needs the

letter to show that she will continue to work with you 23 hours/week after September

30 in order to get an extension on her visa."  On August 15, 2014, Abelmann sent an

email to Plaintiff stating: "I am no longer willing to support your OPT because I am

technically on academic leave.  If [a] lawyer gives me a template for a green card I will

be happy to submit a letter.  I hope you are well.  Nancy."  In response, Plaintiff emailed

Abelmann stating "Thank you.  I will diligently work on obtaining a green card.  Thank

16

you."

At her deposition, Plaintiff admitted she did not know if Abelmann, or anyone else, went in to the University system and terminated Plaintiff's OPT status that was set to end on September 30, 2014.  Abelmann's letter dated August 15, 2014, which was attached to Kelley Frazier's email, stated, in part: "Hye-Young (Lisa) Park has been working for me as a researcher at the University of Illinois.  I have enjoyed collaborating with Ms. Park 23 hours a week since October 15, 2013, at the University of Illinois at Urbana-Champaign (607 S. Mathews Avenue, Urbana, IL 61801).  This collaboration period will end on September 30, 2014."

Plaintiff had twenty hours of OPT with Abelmann, and a separate twenty hours a week with Violet Harris.  To stay legally in the United States, it was Plaintiff's understanding that she only needed twenty hours of OPT.  At her deposition, Plaintiff admitted that "it didn't matter" whether her OPT with Abelmann was terminated because she still had the twenty hours with Harris.

Plaintiff has no knowledge if anyone from ODEA or the University spoke to Abelmann regarding her OPT status.  Both Hudson and ODEA Director Heidi Johnson declared that they did not communicate with Abelmann regarding Plaintiff's OPT status at any time. Julie Misa, Director of the University's International Student and Scholar Services, made a similar declaration.

After Abelmann sent the August 15, 2014 email, she wrote several letters of reference for Plaintiff, including letters for Plaintiff's immigration petition.

On August 22, 2014, Plaintiff had a meeting with Associate Chancellor Reginald Alston to discuss her situation.  That same day, she emailed Johnson requesting a meeting.  Johnson stated that she was unaware of Plaintiff's claims or the investigation, and had no interaction with her until her claims were brought to her attention by Plaintiff in August 2014, after Plaintiff's conversation with Alston.  Plaintiff, however, notes that Hudson testified, in her deposition, that, as director of ODEA, Johnson "should know of what's going on in the office."  On August 22 Plaintiff sent an additional email to Johnson advising her that she was going to focus on her immigration status and asked to hold off on having a meeting with Johnson until after filing her immigration petition.

After completing her immigration petition, Plaintiff revisited her issues with ODEA.  On September 28, 2014, she emailed Johnson and requested a meeting.  On October 1, 2014, she met with Johnson and provided information she thought was relevant to her claims against Secolsky.

After her meeting with Johnson, Plaintiff exchanged follow-up emails with her over the course of October 2014.  On October 17, 2014, Hudson signed an ODEA informal resolution disposition report.  A copy was provided to Plaintiff.  The ODEA's investigation led to the conclusion that Plaintiff was not a student or employee of the University at the time of the investigation, and that Secolsky was not affiliated with the University, nor was he a third party for purposes of Title IX, and that the ODEA had no jurisdiction over him.  The conclusion of the October 17 ODEA report stated as follows:

18

Per the information provided by both Complainant and the Respondents
and after further review, it was determined that neither party has any
affiliation with the University.  Accordingly, ODEA has no jurisdiction over the matter.  The ma
unresolved.  This dispositional report is a clarification of the issues pursuant to the
complaint received by ODEA.  No further action, by this office, is necessary at this time.

After reviewing that report, Plaintiff noted what she perceived to be several

inaccuracies, and communicated this to Johnson.  Following the ODEA investigation, on

November 17, 2014, the Dean of the College of Education sent the following email to

Secolsky:

It has come to my attention that you may be using a title in
correspondence, applications, business cards, etc. that indicate or imply
that you are a Professor or have some affiliation with the University of
Illinois.  You do not have permission from the University of Illinois to
refer to yourself in this manner or imply that you have any affiliation with
the University.  Permission, if any, that may have been granted to you was
done so without any authority to grant such permission.  Accordingly,
please immediately cease and desist referring to yourself in any way that
directly states or implies that you have an affiliation with the University of
Illinois.  Your failure to heed this warning may result in legal action by the
University.  I anticipate and expect your immediate and full cooperation.

Should you have any questions or wish to discuss this further, please
contact me at your convenience.

The Dean also sent a letter to Stake that same day, stating "[u]nder no

circumstances is Mr. Secolsky to use his name in any affiliation with the University of

Illinois at Urbana-Champaign, the College of Education, or the Center for Instructional

Research and Curriculum Evaluation."

On November 18, 2014, Plaintiff had a second meeting with Johnson.  A little

over a week later, she was provided with a revised ODEA informal resolution

disposition report, which concluded that Secolsky had no existing affiliation or formal interaction with the University, and thus ODEA had no jurisdiction over his conduct. The report noted that the matter remained unresolved, but that the report was simply to clarify the issues, and that no further action would be taken by the ODEA at the time.

Plaintiff received her green card on March 8, 2015.

*Procedural History*

Plaintiff filed her Amended Complaint (#44) on March 3, 2016.  The Amended Complaint was necessary after this court issued an Order (#33) dismissing Counts XVI through XIX of the original Complaint (#1).  The Amended Complaint contains the following counts: I- battery against Secolsky; II- assault against Secolsky; III- Illinois hate crimes (720 Ill. Comp. Stat. 5/12-7.1) against Secolsky; IV- Illinois Gender Related Violence (740 Ill. Comp. Stat. 82) against Secolsky; V- false imprisonment against Secolsky; VI- retaliation (775 Ill. Comp. Stat. 5) against Secolsky; VII- retaliatory discharge (42 U.S.C. § 1981) against Secolsky; VIII- intentional infliction of emotional distress against Secolsky; IX- denial of substantive due process (42 U.S.C. § 1983) against Secolsky; X- assault against Stake; XI- battery against Stake; XII- Illinois hate crimes against Stake; XIII- Illinois Gender Related Violence against Stake; XIV- discrimination/hostile educational environment under Title IX against the Board of Trustees; Count XV- denial of substantive due process against Stake, Hudson, and Johnson; and Count XX- retaliation under Title IX against the Board of Trustees.

20

ANALYSIS

All parties in this case have filed motions for summary judgment.  Responses

and replies have been filed, and all motions are now fully briefed.  The court will

address the motions via each count from the Amended Complaint for which summary

judgment is sought.

*Summary Judgment Standard*

Summary judgment is appropriate "if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of

law."  Fed. R. Civ. P. 56(a); see also *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

In ruling on a motion for summary judgment, a district court "has one task and one task

only: to decide, based on the evidence of record, whether there is any material dispute

of fact that requires a trial."  *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir.

1994).  In making this determination, the court must construe the evidence in the light

most favorable to the nonmoving party and draw all reasonable inferences in favor of

that party.  See *Anderson v. Liberty Lobby, Inc.*,  477 U.S. 242, 255 (1986); *Singer v.*

*Raemisch*, 593 F.3d 529, 533 (7th Cir. 2010).  However, a court's favor toward the

nonmoving party does not extend to drawing inferences which are only supported by

speculation or conjecture.  See *Singer*, 593 F.3d at 533.  In addition, this court "need not

accept as true a plaintiff's *characterization* of the facts or a plaintiff's legal conclusion."

*Nuzzi v. St. George Cmty. Consol. Sch. Dist. No. 258*, 688 F. Supp. 2d 815, 835 (C.D. 2010)

(emphasis in original).

21

The party opposing summary judgment may not rely on the allegations contained in the pleadings. *Waldridge*, 24 F.3d at 920. "[I]nstead, the nonmovant must present definite, competent evidence in rebuttal." *Butts v. Aurora Health Care, Inc.*, 387 F.3d 921, 924 (7th Cir. 2004). Summary judgment "is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Koszola v. Bd. of Educ. of City of Chicago*, 385 F.3d 1104, 1111 (7th Cir. 2004), quoting *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003). Specifically, to survive summary judgment, the nonmoving party "must make a sufficient showing of evidence for each essential element of its case on which it bears the burden at trial." *Kampmier v. Emeritus Corp.*, 472 F.3d 930, 936 (7th Cir. 2007), citing *Celotex Corp.*, 477 U.S. at 322-23. When cross motions for summary judgment have been filed, this court must review the record construing all inferences in favor of the party against whom the motion under consideration is made. See *BASF AG v. Great Am. Assur. Co.*, 522 F.3d 813, 818 (7th Cir. 2008).

*Counts I (Secolsky) and XI (Stake)*

Count I of Plaintiff's Amended Complaint alleges that Secolsky committed battery against Plaintiff when, on January 24, 2014, he grabbed Plaintiff's arm "with intent to make physical contact of an insulting or provoking nature with" Plaintiff, without her consent, and without legal justification.

Under Illinois case law, "a civil battery in Illinois is defined as "the unauthorized touching of another's person.'" *Benitez v. American Standard Circuits, Inc.*, 678 F.Supp.2d 745, 767 (N.D. Ill. 2010), quoting *Boyd v. City of Chicago*, 880 N.E.2d 1033, 1043-44 (Ill. App. Ct. 2007). To be liable for battery, the defendant must have done some affirmative act intended to cause an unpermitted contact, but where the party inflicting the injury is not doing an unlawful act, the intent to harm is material. *Glowacki v. Moldtronics, Inc.*, 636 N.E.2d 1138, 1140 (Ill. App. Ct. 1994). However, an action for battery does not depend on the hostile intent of the defendant, but on the absence of the plaintiff's consent to the contact. *Pechan v. DynaPro, Inc.*, 622 N.E.2d 1072, 1084 (Ill. App. Ct. 1993).

Based on the definition of battery in Illinois case law, the court finds it to be an undisputed material fact that Secolsky, when he admittedly touched Plaintiff's hand as she attempted to leave the residence, in an effort to plead with her not to tell Robert Stake about his (Secolsky's) actions, touched Plaintiff in an unauthorized way without her consent. Secolsky had just shown Plaintiff a pornographic film, without her consent or prior knowledge. He was admittedly "angry" with Plaintiff and in a "manic" state. Secolsky also admitted that Plaintiff was upset. Plaintiff herself stated she was shocked and upset. Thus, with this context, Secolsky's admitted touching of Plaintiff's hand, as she attempted to leave his apartment, constitutes a battery under Illinois law.

Further, the court finds that Robert Stake's admitted "thoughtless" and "spontaneous" kissing of Plaintiff on her forehead, without Plaintiff's invitation or consent, was a battery. It was an unauthorized touching without Plaintiff's consent,

indeed a more invasive and intimate unauthorized touch than that committed by Secolsky.  Stake argues that, under the Restatement of Torts, the key question is whether or not "the subject kiss offends a reasonable sense of personal dignity[,]" and the court must look to context, such as the personal relationship between the parties, the time of the contact, and the circumstances involved.  Here, the kiss in question, based on the context, "offends a reasonable sense of personal dignity."  There was no "appropriate" context for the kiss offered up by Stake, who admits it was "spontaneous" and "thoughtless." The fact that they both stared at each other for thirty to sixty seconds, and then parted without saying anything, indicates that Plaintiff was neither expecting nor approving of the kiss.  Plaintiff testified that she was "disgusted" by the kiss and went to the restroom to clean herself up afterwards.  Under these undisputed facts, the court finds the kiss constitutes a battery for Illinois case law purposes.  Judgment is granted in favor of Plaintiff and against Secolsky on Count I, and in favor of Plaintiff and against Stake on Count XI.

*Count II (Secolsky)*

Plaintiff next argues that she is entitled to summary judgment on her assault claim against Secolsky.  Plaintiff claims that Secolsky committed tortious assault when he pointed to his cheek and asked Plaintiff to kiss it.  In Illinois, a common law claim of assault must include an allegation of a reasonable apprehension of an imminent battery, and the elements of a battery must include an intentional act on the part of the defendants and a resulting offensive contact with the plaintiff's person.  *McNeil v.*

24

*Carter*, 742 N.E.2d 1277, 1281 (Ill. App. Ct. 2001).  Here, the undisputed material facts

indicate that, at some point after the January 24, 2014 incident, Secolsky pointed to his

cheek and asked Plaintiff to kiss him.  However, not much else is known concerning the

circumstances of the incident.  Secolsky claims it only happened once, and it is not

known where this occurred, and what happened in the moments surrounding its

occurrence.  Thus, a genuine issue of material fact exists as to whether summary

judgment should be granted on this count, and Plaintiff's motion is denied.

   *Counts III (Secolsky) and XII (Stake)*

   Plaintiff next moves for summary judgment against Secolsky on Count III and

Stake on Count XII, arguing that their actions violated Illinois' hate crime law.  The

section of the law in question states:

> A person commits hate crime when, by reason of the actual or perceived
> race, color, creed, religion, ancestry, gender, sexual orientation, physical or
> mental disability, or national origin of another individual or group of
> individuals, regardless of the existence of any other motivating factor or
> factors, he commits assault, battery, aggravated assault, misdemeanor
> theft, criminal trespass to residence, misdemeanor criminal damage to
> property, criminal trespass to vehicle, criminal trespass to real property,
> mob action, disorderly conduct, harassment by telephone, or harassment
> through electronic communications as these crimes are defined in Sections
> 12-1, 12-2, 12-3(a), 16-1, 19-4, 21-1, 21-2, 21-3, 25-1, 26-1, 26.5-2, and
> paragraphs (a)(2) and (a)(5) of Section 26.5-3 of this Code, respectively.

720 Ill. Comp. Stat. 5/12-7.1(a).

   First, with regard to Secolsky, Plaintiff argues that Secolsky's assault against

Plaintiff when he attempted to kiss her and showed her the sexually explicit video was

motivated in part by Plaintiff's gender.  She also argues that Secolsky's showing her the

video was motivated in part by her race.  For an assault or battery to become a hate crime under Illinois law, it must be motivated by the race or gender of the victim.  See *Davis v. Peoria County*, 2009 WL 3258318, at *11 (C.D. Ill. Oct. 8, 2009).  First, the court would note that Plaintiff has changed her claim regarding hate crimes against Secolsky from the Amended Complaint, where she alleged it was based on Secolsky's telephone calls, to her motion for summary judgment, where she argues that Secolsky assaulted Plaintiff when he showed her the sexually explicit video and asked her to kiss him.  In any event, the court has found a genuine issue of material fact exists as to whether Secolsky assaulted Plaintiff when he asked her to kiss him.  Further, as it concerns the showing of the pornographic film, there has been no argument made, or finding made by this court, that it constituted tortious assault.  It is disputed whether Secolsky's showing of the film was motivated by Plaintiff's race or gender.  Secolsky may have wanted to teach Plaintiff about "American culture," but it is not clear whether the motivation stemmed from the fact that Plaintiff was from Korea, as opposed to Secolsky's desire to teach Plaintiff about American culture (a bizarre argument offered by Secolsky).  Secolsky did not state that he was showing her the film because she was Korean.  The trier of fact is better suited to determine if, essentially, "non-American" would qualify under the statute as national origin or race.  Secolsky has also stated that he was in a hypomanic state, and that the motivation for showing the film was because of Plaintiff's "controlling  behavior" and "use of the n-word."  Secolsky's behavior, as testified to by Plaintiff and in some respects admitted by Secolsky himself, was

disturbing, and may very well have been motivated by Plaintiff's race/national origin or gender.  However, the court believes it is up to the jury to determine if it violated the Illinois hate crimes law.

Next, with regard to the actions of Defendant Stake, the court believes a genuine issue of material fact remains for trial on whether the kiss was motivated by Plaintiff's gender.  Stake may very well have kissed Plaintiff because she was a woman.  However, at summary judgment, the court must take the facts in the light most favorable to the non-moving party.  Stake testified at his deposition that he kissed Plaintiff "spontaneously, thoughtlessly[.]" It is thus unknown if Stake was motivated to commit a battery on Plaintiff because of her gender.  This is an issue best decided by the trier of fact, where Defendant Stake can be questioned on the stand by counsel.  Summary judgment is denied on Counts III and XII.

*Count XIII (Stake)*

Plaintiff next argues that summary judgment should be granted in her favor on her gender-related violence claim against Stake.  For the reasons stated above in the court's discussion on Count XII, summary judgment is denied on this count.

*Count V (Secolsky)*

Plaintiff next argues that summary judgment should be granted in her favor on her claim of false imprisonment against Secolsky.  "A private person may be held liable in Illinois for false imprisonment when 'his personal liberty was unreasonably or unlawfully restrained against his will and [the] defendant(s) caused or procured the

27

restraint.'" *Mayorov v. United States*, 84 F.Supp.3d 678, 700 (N.D. Ill. 2015), quoting *Vincent v. Williams*, 664 N.E.2d 650, 654 (Ill. App. Ct. 1996). "In order for a false imprisonment to be present, there must be actual or legal intent to restrain." *Lopez v. Winchell's Donut House*, 466 N.E.2d 1309, 1311 (Ill. App. Ct. 1984). Unlawful restraint may be effected by words alone, by acts alone, or both; however actual force is unnecessary to an action in false imprisonment. *Lopez*, 466 N.E.2d at 1311.

Here, Plaintiff alleges that the restraint happened when Secolsky touched Plaintiff's hand as she attempted to leave his apartment and "blocked her departure" on January 24, 2014. However, as noted in Plaintiff's Undisputed Material Fact number 14, when questioned about Plaintiff's claim that he "spread his arms and blocked her from exiting his apartment," Secolsky responded that he did not know if he did so, and that he "didn't think" that he was blocking her exit, but that he wanted to say "say it [please don't tell Bob Stake] one more time before she left." Taking this statement in the light most favorable to Secolsky, he touched Plaintiff's hand for the purpose of emphasizing to her one more time, before she left the apartment, that he hoped she would not tell Robert Stake about the incident (presumably meaning Secolsky's showing pornography to Plaintiff). While the court earlier found that such touching was clearly unauthorized and unconsented to by Plaintiff so as to constitute a battery based on the circumstances, the court cannot say that these facts conclusively demonstrate that Secolsky intended to *restrain* Plaintiff, a showing necessary to demonstrate false imprisonment. See *Lopez*, 466 N.E.2d at 1311. Again, this is a determination best left to the trier of fact at trial.

28

Plaintiff's motion is denied as to Count V.

   *Count VIII (Secolsky)*

   Plaintiff next argues that summary judgment should be granted in her favor

against Secolsky on her claim of intentional infliction of emotional distress (IIED).  The

elements of IIED in Illinois are as follows:

> First, the conduct involved must be truly extreme and outrageous. Second,
> the actor must either intend that his conduct inflict severe emotional
> distress, or know that there is at least a high probability that his conduct
> will cause severe emotional distress. Third, the conduct must in fact cause
> severe emotional distress.

*Feltmeier v. Feltmeier*, 798 N.E.2d 75, 80 (Ill. 2003).

   Plaintiff cites numerous examples of IIED by Secolsky upon her in support of her

argument: Secolsky's mishandling and ultimate halting of Plaintiff's visa application;

his assaults; battery; false imprisonment; and telephone harassment.  As noted above,

the court has found that genuine issues of material fact exist as to the assault and false

imprisonment claims.  Further, the court cannot say at this stage that the telephone

harassment, without knowing the exact content and nature of the calls, constituted

"truly extreme and outrageous" conduct.  See *Feltmeier*, 798 N.E.2d at 80.  Nor can

judgment be granted in Plaintiff's favor on Secolsky's failure to obtain a visa.  This is

better left to the trier of fact to decide.

   The court has granted Plaintiff's motion with regards to her claim of a battery

against Secolsky.  However, even were the court to find Secolsky's behavior

surrounding the incident to be "truly extreme and outrageous," it is not entirely clear

that, at the time, Secolsky intended that his conduct inflict severe emotional distress, or knew that there was at least a high probability that his conduct would cause severe emotional distress. See *Feltmeier*, 798 N.E.2d at 80. When asked if he intended to shock Plaintiff, Secolsky responded that "he didn't care" and just "wanted to do what I wanted to do" in his own house, and that he was angry at Plaintiff. He claims to have been in the midst of a manic episode. Plaintiff points to Secolsky's knowledge that she was under psychiatric care, and that he thought she might be suicidal. However, it is not clear when Secolsky obtained this knowledge, and when he decided she might be suicidal. It could have been after the January 24, 2014 incident. The court finds that judgment should be denied on this count, and the matter is best left to resolution by the trier of fact.

*Count IX (Secolsky)*

Plaintiff next argues that she is entitled to summary judgment on her claim that Secolsky violated her right to substantive due process under the Fourteenth Amendment, pursuant to 42 U.S.C. § 1983. Plaintiff argues that Secolsky was a state actor who deprived her of her Fourteenth Amendment right to bodily integrity and equal protection when he: (1) discriminated against her in her education on the basis of her race by commenting on how, as an Asian woman, she needed to learn about American culture; and (2) sexually harassed, and discriminated against, Plaintiff when he subjected her to a pornographic movie and made harassing phone calls and requests. Defendants respond that Secolsky was not a state actor and, even if he was, he did not

violate Plaintiff's Fourteenth Amendment rights.

To state a claim upon which relief can be granted under § 1983, Plaintiff must allege that Secolsky caused her to suffer a constitutional injury while acting under color of state law.  See *Twyman v. Burton*, 757 F.Supp.2d 804, 807 (S.D. Ind. 2010).  The court must first determine whether Secolsky was a state actor and whether the conduct complained of constituted state action.

### State Actor

"To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law."  *West v. Atkins*, 487 U.S. 42, 48 (1988).  Plaintiff does not argue that Secolsky was an actual state employee, *i.e.* that he was actually employed by the University of Illinois, and thus had actual authority as a state actor.  Rather, Plaintiff argues that Secolsky was "clothed" with the apparent authority of state law, and was therefore acting under the color of state law.  Defendants respond that there is no basis, in the Seventh Circuit, for the "apparent authority" argument, and that no test recognized by the Seventh Circuit would qualify Secolsky as a state actor.  Defendants are correct, and Plaintiff appears to concede, that the Seventh Circuit does not appear to have an "apparent authority" test to determine if someone is a state actor.  However, Plaintiff argues that the tests employed by the Seventh Circuit are not meant to be exclusive to the circuit, and that this court should adopt the apparent authority formula used by other courts.

31

The Seventh Circuit, in *Rodriguez v. Plymouth Ambulance Service*, 577 F.3d 816 (7th Cir. 2009), discussed the difficulty in determining when an ostensibly private person, not officially or clearly employed by the state, became a state actor for § 1983 purposes:

> Both the Supreme Court and the lower federal courts have acknowledged the difficulty of determining whether a private entity has acted under the color of state law. As our colleagues on the Second Circuit have noted, this determination constitutes "one of the more slippery and troublesome areas of civil rights litigation." However, we have not been left foundering in uncharted waters; recent years have witnessed a long line of decisions in which the Supreme Court has given us significant guidance.

> At its most basic level, the state action doctrine requires that a court find such a "close nexus between the State and the challenged action" that the challenged action "may be fairly treated as that of the State itself." In *Rendell–Baker v. Kohn*, 457 U.S. 830, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982), the Supreme Court wrote that "[t]he ultimate issue in determining whether a person is subject to suit under § 1983 is the same question posed in cases arising under the Fourteenth Amendment: is the alleged infringement of federal rights 'fairly attributable to the State?'" In most cases, the state actor is an officer or employee of state government, and it is easy to conclude that the person's actions are fairly attributable to the state. However, the Court has long recognized that, on some occasions, the acts of a private party are fairly attributable to the state because the party has acted in concert with state actors. In *Blum v. Yaretsky*, 457 U.S. 991, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982), the Supreme Court held that "a State normally can be held responsible for a private decision only when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State."

> Moreover, the Court has set forth several tests for us to employ in evaluating the "range of circumstances" that might constitute state action. We recognize that these formulations are susceptible to semantic variations, conflations and significant overlap in practical application; we further recognize that they "lack rigid simplicity." Nevertheless, we believe that it is useful to describe these tests as the symbiotic relationship test, the state command and encouragement test, the joint participation doctrine and the public function test.

*Rodriguez*, 577 F.3d at 823-24 (citations omitted).

Plaintiff does not argue that Secolsky qualifies under any of the specific tests

articulated in *Rodriguez*. However, "[d]espite the nominal existence of these tests, the

Seventh Circuit has made clear that its (and the Supreme Court's) precedents have

'revealed that these cases do not so much enunciate a test or series of factors, but rather

demonstrate examples of outcomes in a fact-based assessment.'" *Phillips v. Quality*

*Terminal Services, Inc.*, 855 F.Supp.2d 764, 768 (N.D. Ill. 2012). Rather, Plaintiff asks the

court to adopt the reasoning of the Tenth Circuit in *Jojola v. Chavez*, 55 F.3d 488 (10th Cir.

1995), which stated:

> The traditional definition of acting under color of state law requires that
> the defendant in a § 1983 action have exercised power "possessed by
> virtue of state law and made possible only because the wrongdoer is
> clothed with the authority of state law. " The authority with which the
> defendant is allegedly "clothed" may be either actual or apparent.

*Jojola*, 55 F.3d at 492-93 (citations omitted).

One of the cases cited by the *Jojola* court in support of considering a private

person clothed in "apparent authority" to be a state actor was the U.S. Supreme Court's

decision in *Griffin v. Maryland*, 378 U.S. 130 (1964). In that case, a Maryland sheriff's

deputy was working as a private security guard at a private amusement park when he

arrested several people for trespassing. Even though he was working in his capacity as

a private security guard, he wore, on the outside of his uniform, his deputy sheriff's

badge. The Court found that the arrest, even though it was done while on duty as a

private security guard, constituted state action by a state actor, writing:

33

> If an individual is possessed of state authority and purports to act under that authority, his action is state action. It is irrelevant that he might have taken the same action had he acted in a purely private capacity or that the particular action which he took was not authorized by state law. Thus, it is clear that Collins' action was state action.

*Griffin*, 378 U.S. at 135 (citations omitted).

The court finds the reasoning advanced in *Jojola*, based on the decision in *Griffin*, to be well-taken. Obviously, if someone has been clothed in state authority and acts pursuant to that authority, whether that authority is actual or apparent, they should be considered a state actor. However, there must be reasonable trappings of that authority, and the action complained of must be related to the person's function as a state actor. This reasoning runs concurrent to the public function test, which examines whether a private actor performs a function that is exclusively reserved to the state. *Eastes v. ACS Human Services, LLC*, 822 F.Supp.2d 843, 846 (N.D. Ind. 2011). This test recognizes that an entity may be a state actor for some purposes but not for others, so courts must be careful to identify the specific function about which the plaintiff complains and then ask whether that particular conduct is fairly attributable to the state, which is done by examining whether there is a "close nexus" between the state and the challenged action. *Eastes*, 822 F.Supp.2d at 846.

Whether the defendant at issue is a public employee or private person allegedly acting under color of law, there must be sufficient connection between the conduct complained of and the state. See *Luce v. Town of Campbell, Wis.*, 872 F.3d 512, 514 (7th Cir. 2017) (a public employee's acts occur under color of state law when they relate to

34

official duties); *Wade v. Byles*, 83 F.3d 902, 905 (7th Cir. 1996) (In general terms, before a

private party's conduct can be considered state action, there must be a sufficiently close

nexus between the state and the private conduct so that the action "may be fairly

treated as that of the State itself"); *Hallinan v. Fraternal Order of Police Chicago Lodge No.

7*, 570 F.3d 811, 815 (7th Cir. 2009) (In order to be characterized as state action, "the

deprivation [of constitutional rights] must be caused by the exercise of some right or

privilege created by the State or by a rule of conduct imposed by the [S]tate or by a

person for whom the State is responsible ... [and] the party charged with the deprivation

must be a person who may fairly be said to be a [S]tate actor.").

Such a formulation was also applied by the Tenth Circuit in *Jojola*:

 As we have stated, before conduct may be fairly attributed to the state
because it constitutes action "under color of state law," there must be "a
real nexus" between the employee's use or misuse of their authority as a
public employee, and the violation allegedly committed by the defendant.
Such an interpretation is entirely consistent with the Supreme Court's
pronouncement that § 1983 is only intended to deter state officials from
"using the badge of their authority" to deny citizens their federally
protected rights. Therefore, it is the plaintiff's burden to plead, and
ultimately establish, the existence of "a real nexus" between the
defendant's conduct and the defendant's "badge" of state authority in
order to demonstrate action was taken "under color of state law."

*Jojola*, 55 F.3d at 493 (citations omitted).

Here, there is no question that Defendant Robert Stake was an agent, or

employee, of the University of Illinois.  He brought Secolsky to the University, listed

himself and Secolsky as instructors in the EPSY490E class, allowed Secolsky to

substitute teach his courses, present papers, lecture on survey research methodology,

advise and mentor doctoral students in Stake's case study classes, and even suggested that Secolsky use the title "Professor, visiting CIRCE, Illinois." To any student or outside observer, who did not have access to University personnel files, Secolsky had all the appearance and authority of an employee/instructor at the University of Illinois. Thus, it is no stretch to label Secolsky a state actor for § 1983 purposes, if the alleged constitutional violation were related to his apparent position at the University. Before Secolsky's conduct can be attributed to the state, however, there must be "a real nexus" between his use or misuse of his authority as a public employee, and the violation allegedly committed by him. See *Jojola*, 55 F.3d at 493; *Luce*, 872 F.3d at 514.

Plaintiff's allegations under § 1983 against Secolsky concern his statements about "American culture" and sexual harassment/discrimination, which implicates the January 24 and March 8, 2014 incidents. Before that, Plaintiff had met Secolsky in fall 2013 and developed an "academic relationship," that included collaborating on academic matters, such as Secolsky's grant proposals, Secolsky's conference paper to the CREA at the University, and the Thailand Seminar Series at the University. However, she also sent Secolsky sections of the book she was working on to review. Both sides acknowledged that, on those days, they were "working at Secolsky's apartment." Plaintiff testified that they were working on a grant proposal for CREA. Once that was completed, and she was about to leave, Secolsky showed her the pornographic film. Secolsky, however, testified that he believed they were working on Plaintiff's book. There is no evidence in the record, at least the record as presented by

36

the parties, as to why Plaintiff was at Secolsky's apartment on March 8, 2014.

It is well established that sexual harassment by a state actor under color of state law violates the Equal Protection Clause and is actionable under § 1983. *Locke v. Hassig*, 788 F.3d 662, 667 (7th Cir. 2015). Thus, the question becomes, at the January 24 and March 8, 2014 incidents, was Secolsky acting under the color of state law? Action is taken under color of state law when it involves a misuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law, and as a result, acts by a state officer are not made under color of state law unless they are related in some way to the performance of the duties of the state office. *Valentine v. City of Chicago*, 452 F.3d 670, 682-83 (7th Cir. 2006). If, as Plaintiff claims, she was working with Secolsky on his grant proposal for CREA at the time of the harassment, it is possible she was aiding Secolsky pursuant to his duties with the University of Illinois. If, as Secolsky stated, she was there working with Secolsky on her book, she likely would have been at Secolsky's apartment for a reason having nothing to do with his apparent state association. This question is, at least, a genuine issue of material fact. The jury will decide whether Secolsky's conduct was connected in some way to the performance of his duties related to his association with the University. Therefore, both Plaintiff's and Defendant's motions for summary judgment on this count, with regard to state action, must be denied.

Plaintiff's Fourteenth Amendment Rights

Defendants next argue that, even if Secolsky was a state actor and the conduct in

37

question can be characterized as state action, he did not violate Plaintiff's Fourteenth Amendment rights.  Plaintiff alleges that Secolsky sexually harassed/discriminated against her, violated her bodily integrity, and racially discriminated against her.

First, the court will analyze Plaintiff's § 1983 equal protection sexual harassment claim.  Under equal protection, a plaintiff can make an ultimate showing of sex discrimination either by showing that sexual harassment that is attributable to the employer under § 1983 amounted to intentional sex discrimination or by showing that the conscious failure of the employer to protect the plaintiff from the abusive conditions created by fellow employees amounted to intentional discrimination.  *Valentine*, 452 F.3d at 683.  To show intent for equal protection purposes, it is not necessary to show that all women employees were sexually harassed, because harassment of the plaintiff alone because of her sex is enough.  *King v. Board of Regents of University of Wisconsin System*, 898 F.2d 533, 538 (7th Cir. 1990).  Still, such harassment must rise to the level of intentional sex discrimination in that Plaintiff must demonstrate that Secolsky intended to harass her because of her gender, and, thus, Plaintiff's burden under § 1983 exceeds that under Title VII in that she must demonstrate that Secolsky harbored a discriminatory purpose.  See *Guy v. State of Illinois*, 958 F.Supp. 1300, 1307 (N.D. Ill. 1998).

Here, Defendants argue that there is no evidence in the record that Secolsky intended to discriminate or harass Plaintiff on the basis of her gender.  Rather, Defendants argue Secolsky's conduct was borne of characteristics personal to Plaintiff.

38

Defendants point to *Doe v. Board of Education of Community High School District 218*, 2017 WL 2672076 (N.D. Ill. June 19, 2017), in which the court, relying on the Seventh Circuit case *Trautvetter v. Quick*, 916 F.2d 1140 (7th Cir. 1990), dismissed a § 1983 equal protection claim because "[s]exual harassment based solely on personal attraction does not amount to discrimination based on gender" and the complaint failed to plausibly state that the defendant sought out the plaintiff "for any reason other than personal attraction." *Doe*, 2017 WL 2672076, at *3. The *Trautvetter* decision, cited by the court in *Doe*, held that "if, as a purely personal matter, a supervisor and a particular employee do find each other sexually attractive, it would not be sexually discriminatory under the equal protection clause for the two to engage in sexual activity." *Trautvetter*, 916 F.2d at 1152.

> The court continued:
>
> Applying these principles of equal protection jurisprudence, enunciated by the court in *Huebschen* [*v. Dept. of Health and Social Services*, 716 F.2d 1167 (7th Cir. 1983)], to Ms. Trautvetter's equal protection allegations under § 1983, we conclude that she has not raised a genuine issue of material fact as to whether Mr. Quick's sexual advances were because of her status as a woman. Certainly, the underlying fact is that Ms. Trautvetter is a woman. But, as we have noted, her status as a woman does not itself support an allegation of sexual harassment under the equal protection clause; she must demonstrate in a colorable manner that Mr. Quick's advances were because of her status as a woman as opposed to characteristics, albeit some no doubt sexual, which were personal to her. This she has failed to do. Indeed, there is nothing in the record to indicate that Mr. Quick's feelings were based on anything but a personal attraction to Ms. Trautvetter. Ms. Trautvetter's own testimony leads us to this conclusion; in reference to the March 13, 1987 phone call, Ms. Trautvetter testified that Mr. Quick told her that he "had feelings for her" and he thought they should get together and talk about it.

*Trautvetter*, 916 F.2d at 1152.

The *Trautvetter* decision has been greatly criticized by at least one court in this circuit.  In *Owens v. Ragland*, 313 F.Supp.2d 939 (E.D. Wisc. 2004), the court found it "difficult if not impossible to extrapolate a clear holding from *Trautvetter*," because the Seventh Circuit "did not explain to what extent personal attraction and sex discrimination were mutually exclusive concepts and it did not set forth any guidelines for determining when sexual harassment is based solely on personal attraction and when it is based on sex."  *Owens*, 313 F.Supp.2d at 946.  The *Owens* court also noted that earlier Seventh Circuit cases had held that sexual harassment based on sexual desire could be harassment because of sex and that a woman in a sexual harassment case need not show that other women were also sexually harassed.  *Owens*, 313 F.Supp.2d at 946-47.  *Owens* went on to note that *Trautvetter* was "somewhat of a jurisprudential orphan" because the "court of appeals has cited *Trautvetter* few times since it was decided; the court has never again relied on its reasoning regarding 'personal characteristics' to deny a sex discrimination claim[,]" and that, "[r]ather, the court has assumed repeatedly that sexually explicit conduct by a man toward a woman is 'because of sex.'" *Owens*, 313 F.Supp.2d at 947.  The court ultimately denied the defendant's motion for summary judgment "[b]ecause there is nothing in the record to suggest that defendant would have made sexual advances toward plaintiff if she were male."  *Owens*, 313 F.Supp.2d at 947.

In *Chivers v. Central Noble Community Schools*, 423 F.Supp.2d 835 (N.D. Ind. 2006),

a male tennis coach at a high school was sending sexually harassing instant messages to a seventeen year old female student.  The court had to determine whether the harassment was because of sex or whether it was merely in spite of her gender.  *Chivers*, 423 F.Supp.2d at 852.  The court immediately distinguished its case from *Trautvetter* and *Huebschen*, noting that "[i]t is not insignificant that the claims in *Huebschen* arose out of a failed office romance and in *Trautvetter*, the principal of a school courted a teacher for an intimate relationship that the parties eventually consummated and maintained for some time before the plaintiff claimed that she was pressured into the relationship." *Chivers*, 423 F.Supp.2d at 852.  The *Chivers* court then cited to a different Seventh Circuit decision, *Volk v. Coler*, 845 F.2d 1422 (7th Cir. 1988), where the court:

> distinguished its holding in *Huebschen* because the plaintiff's testimony depicted an abusive environment in which she was allegedly victimized against her will, not one in which a consensual romance disintegrated. The court stated that "[d]iscrimination and harassment against an individual woman because of her sex is a violation of the equal protection clause." The plaintiff's sex was an immutable characteristic and even if the defendant "did not choose to offend all women with whom he had contact, the law does not require such uniform treatment." The Seventh Circuit has specifically rejected the argument that harassment based on sexual desire is not based on gender.

*Chivers*, 423 F.Supp.2d at 852.

The *Chivers* court concluded that the defendant had not established, as a matter of law, that his actions were motivated by factors other than the plaintiff's gender and his desire to have a sexual relationship with her as a female.  *Chivers*, 423 F.Supp.2d at 852.

The court finds the situation in the instant case to be more akin to the situations present in *Owens* and *Chivers* than *Trautvetter.*  There was no pre-existing consensual romantic relationship between Plaintiff and Secolsky, nor was there an eventual consensual sexual relationship after the fact.  Defendants have not established, as a matter of law, that Secolsky's actions were motivated by factors other than Plaintiff's gender and his desire to have a sexual relationship with her as a female.  See *Chivers*, 423 F.Supp.2d at 852.  Therefore, it will be up to the trier of fact to determine whether Secolsky intended to harass/discriminate against Plaintiff on the basis of her gender.

Gender discrimination claims arising under the Equal Protection Clause and Section 1983 are generally evaluated under substantially the same framework as Title VII claims.  *Lockwood v. McMillan*, 237 F.Supp.3d 840, 866 (S.D. Ind. 2017).  A Title VII sexual harassment claimant must demonstrate: (1) her work environment was both objectively and subjectively offensive; (2) the harassment she complained of was based on her sex; (3) the conduct was either severe or pervasive; and (4) there was a basis for employer liability.  *Passananti v. Cook County*, 689 F.3d 655, 664 (7th Cir. 2012).

The court finds that a genuine issue of material fact exists that the showing of the pornographic film by itself, unwanted and unbidden by Plaintiff, is subjectively and objectively offensive.  Further, the court has already determined a genuine issue of material fact exists as to whether the complained of harassment was due to Plaintiff's sex.  Finally, the court notes that the sexual harassment claims are multiple: the showing of the pornographic film, the discussion of sexual acts on another occasion, and,

42

according to Plaintiff, the multiple attempts by Secolsky to get Plaintiff to kiss him. A genuine issue of material fact exists as to whether the claims are severe or pervasive.

Plaintiff's claim of racial discrimination under equal protection, however, is more problematic. She can cite only to her claim that Secolsky commented about "American culture," and that he, at some other times, stated that "Asian women like white men" and nothing else. The citation to just one rather ambiguous comment, and another comment where nothing about the context of the comment is known, is not sufficient to show discriminatory intent, and Plaintiff has made no showing that any alleged racial discrimination was so severe or pervasive to create a hostile work environment so as to be a violation of equal protection under § 1983. See *Williams v. Seniff*, 342 F.3d 774, 790-91 (7th Cir. 2003).

<u>Substantive Due Process Claim- Bodily Integrity</u>

Sexual harassment claims brought under § 1983 are traditionally analyzed in the context of the Equal Protection Clause, however, the substantive component of the Due Process Clause may also come into play when a plaintiff alleges that her bodily integrity was violated by a state actor. *Wilson v. Cook County*, 742 F.3d 775, 780-81 (7th Cir. 2014). The key standard for determining a substantive due process claim is whether the action would "shock the conscience of federal judges" and, more on-point, the Seventh Circuit has indicated that, in the context of battery, the right to bodily integrity is infringed only by a serious battery—not a battery that is nominal or trivial. *Twyman v. Burton*, 757 F.Supp.2d 804, 809 (S.D. Ind. 2010).

43

The district court in *Twyman*, when confronted with this issue, asked "[s]o what kind of battery does amount to a constitutional deprivation?" and determined that "'serious' sexual assault implicates the substantive due process liberty interest in bodily integrity." *Twyman*, 757 F.Supp.2d at 809.  In *Twyman*, the defendant, a police officer, showed the plaintiff a picture of one of her sex toys (the picture was taken in the plaintiff's home when she was not present), and then proceeded to put the sex toy in her seat, knowing she would sit on it.  Analyzing case law, the court found that rape committed under the color of state law was actionable under § 1983, but other conduct, such as a male police officer, during a voluntary ride-along with an 18–year–old female, asking her to strip, repeatedly trying to kiss her, forcing his hand between her thighs, and groping her breasts, did not state a substantive due process claim. *Twyman*, 757 F.Supp.2d at 809.  Nor did a fire marshal writing a love note and intimately pressing his face against plaintiff and breathing on her neck. *Twyman*, 757 F.Supp.2d at 809-10.  The court noted that, in determining these claims, weight was given to specific factors, such as duration and whether force was used. *Twyman*, 757 F.Supp.2d at 810.  Thus, the court concluded that the officer's conduct, though reprehensible, was not a substantive due process violation because the duration of the  harassment was not protracted; force was not used; the plaintiff was not directly touched; and to the extent the officer committed indirect battery by sex toy, this battery was not sufficiently severe to give rise to a substantive due process claim. *Twyman*, 757 F.Supp.2d at 810.

In this present case, the court must come to the same conclusion as the court in

*Twyman*.  The only actual physical contact alleged was Secolsky grabbing her shoulders momentarily to prevent her from leaving after showing her the pornographic film. Plaintiff does not say how long this lasted, nor was the touching sexual in nature.  It was certainly a battery, but not a "serious sexual assault," such as the kind recognized for a violation of bodily integrity under substantive due process.  This is more akin to the situation present in *Twyman*, and far below the situation noted by the *Twyman* court from *Decker v. Tinnel*, 2005 WL 3501705 (N.D. Ind. Dec. 20, 2005), where the court found no substantive due process violation even though an adult male police officer groped the breasts and put his hand between the legs of a teenaged female ride-along. Plaintiff's substantive due process violation of bodily integrity claim cannot stand.

Summary judgment is granted in part and denied in part on Count IX.  Judgment is granted in favor of Secolsky on Plaintiff's equal protection racial discrimination claim and substantive due process bodily integrity claim.  Judgment is denied on Plaintiff's equal protection sexual harassment/discrimination claim.

*Count XIV (Board of Trustees)*

Defendants Board of Trustees argue that summary judgment should be granted in their favor on Count XIV, wherein Plaintiff claims that she suffered sexual discrimination/harassment and a hostile work environment under Title IX.

Title IX prohibits discrimination on the basis of sex in educational programs or activities that are supported by federal financial assistance. 20 U.S.C. § 1681(a); *Hansen v. Board of Trustees of Hamilton Southeastern School Corp.*, 551 F.3d 599, 604 (7th Cir. 2008).

45

In enacting Title IX, Congress sought to hold educational institutions liable for their own misconduct, not for the misconduct of an employee, but, that being said,  a teacher's sexual harassment of a student may render a school district liable for sex discrimination under Title IX.  *Hansen*, 551 F.3d at 605.  "When a Title IX claim for damages against the educational institution is based on a teacher's conduct, the plaintiff must prove that 'an official of the school district who at a minimum has authority to institute corrective measures … has actual notice of, and is deliberately indifferent to, the teacher's misconduct.'"  *Hansen*, 551 F.3d at 605, quoting *Gebser v. Lago Vista Independent School Dist.*, 524 U.S. 274, 277 (1998).  Thus, a school district is subject to a private damages action only where it is deliberately indifferent to known acts of discrimination or harassment.  *Hansen*, 551 F.3d at 605.  That harassment must be so pervasive, severe, and objectively offensive that it denied the student equal access to education.  *Trentadue v. Redmon*, 619 F.3d 648, 654 (7th Cir. 2010).  Similarly, for hostile work environment, in order for a plaintiff to recover the employer must act "intentionally … by remaining deliberately indifferent to acts … of which it had actual knowledge."  *Lucero v. Nettle Creek School Corp.*, 566 F.3d 720, 731 (7th Cir. 2009).

To impose liability and find deliberate indifference, "school officials' response to known harassment also must have been 'clearly unreasonable in light of the known circumstances.'"  *Doe v. Galster*, 768 F.3d 611, 614 (7th Cir. 2014), quoting *Davis v. Monroe County Board of Education*, 526 U.S. 629, 648 (1999).  School administrators must continue to enjoy the flexibility they require in disciplinary decisions unless their response to

46

harassment is clearly unreasonable. *Doe*, 768 F.3d at 619. Deliberate indifference means shutting one's eyes to a risk one knows about but would prefer to ignore and must, "at a minimum, cause students to undergo harassment or make them liable or vulnerable to it." *Doe 4 v. Freeburg Community Consolidated School Dist. No. 70*, 2017 WL 3839431, *6 (S.D. Ill. Sept. 1, 2017), quoting *Davis*, 526 U.S. at 645. In addition to actual knowledge, the school district must have substantial control over both the harasser and the context in which the known harassment occurs, which is essential for Title IX liability because a school district cannot be liable for its indifference to harassment that it lacks the authority to prevent. *Doe-2 v. McLean County Unit Dist. No. 5 Board of Directors*, 593 F.3d 507, 512 (7th Cir. 2010), citing *Davis*, 526 U.S. at 644-45.

The court has already determined that a genuine issue of material fact exists as to whether Secolsky was a state actor, and whether his actions in harassing Plaintiff prior to June 2014 were state action. The key question for summary judgment purposes is whether, after Plaintiff put Defendants on actual notice on June 21, 2014, Defendants were deliberately indifferent to Secolsky's misconduct.

The court agrees with Defendants that they were not deliberately indifferent. First, it should be noted that Plaintiff could not name any specific instance of sexual harassment by Secolsky of her after June 21, 2014. Second, and more importantly, there is no evidence that the interactions between Secolsky and Plaintiff, after she put Defendants on actual notice, had anything to do with his position at the University and her position as a student. Rather, by the middle of July 2014, Plaintiff had signed an

47

employment contract with Secolsky, and was working for him as a private employee. This is a relationship that the University would have no jurisdiction or power over. Plaintiff does claim that, between July 1 and August 2, 2014, Secolsky did things Plaintiff considered to be a form of harassment, such as repeated phone calls to ask her to pick things up for him from the pharmacy or run errands, clean his apartment, and leaving messages with no content. However, Plaintiff did not report those events, and, in any case, Plaintiff has presented no evidence that this alleged harassment was done in the context of Secolsky's and Plaintiff's respective relationships with the University, as opposed to Plaintiff's private employment with Secolsky's company. Further, anything involving the visa application through Secolsky's company was clearly in the private employment context. At summary judgment, Plaintiff must present definite, competent evidence in rebuttal. See *Butts,* 387 F.3d at 924. From July through August 2014, Plaintiff continued to associate with Secolsky by her own volition via her private employment with him and his company. She simply has not shown that, once Defendants were on actual notice, any further harassment occurred due to any connection involving Plaintiff or Secolsky's position with the University. Thus, Defendants cannot be said to have done anything, once put on notice, that caused Plaintiff "to undergo harassment or make [her] liable or vulnerable to it." See *Davis*, 526 U.S. at 645.

The court would further note that, apart from the fact that the interactions between Plaintiff and Secolsky once she put Defendants on notice were entirely in the

48

private employment context, the response of Defendants was not deliberately indifferent.  Once informed of the allegations on June 21, 2014, Defendants launched an investigation.  Even after this, Plaintiff continued to associate with Secolsky, joining his company as his employee in order to secure a visa.  On July 1, 2014, Plaintiff informed Hudson that she had agreed to be hired by Secolsky the day before, and did not want Hudson to take any further action.  Hudson informed Plaintiff that it appeared that Secolsky was not affiliated with the University, and thus ODEA would have no jurisdiction over him.  Plaintiff responded that she did not want further assistance from ODEA if that was going to be their position.  On August 4, 2014, Hudson met with Stake to discuss Plaintiff's issues.  The next day, Secolsky met with Hudson and admitted to the January 2014 incident, but denied kissing, touching, or otherwise harassing Plaintiff.  Over the next weeks, Plaintiff and Hudson would email back and forth.  On October 1, 2014, Plaintiff met with Johnson, and provided information on Secolsky.  On October 17, 2014, the ODEA concluded neither Plaintiff nor Secolsky were affiliated with the University, and that ODEA therefore had no jurisdiction over Secolsky.  On November 17, 2014, nearly five months after Plaintiff provided notice, the Dean of the College of Education sent Secolsky an email demanding he cease and desist from referring to himself as being affiliated with the University in any way.   The dean sent a letter to Stake that same day ordering that Secolsky could not use his name in any affiliation with the University.

Defendants took what action they believed to be appropriate, and much of it was

49

guided by their belief that Secolsky was not affiliated in any way with the University, and thus ODEA could have no jurisdiction over him.  The court agrees with Plaintiff that the five months it took for Secolsky, and Stake, to be told to stop claiming University affiliation was rather long.  However, Defendants (1) listened to Plaintiff's complaints; (2) initiated an investigation into Secolsky; (3) responded promptly to Plaintiff; and (4) took what action they believed they could, due to Secolsky's nebulous connection with the University.

Plaintiff provides a list of suggested actions Defendants *should* have taken, such as ordering Secolsky to stay off campus completely, ordering Stake to withdraw his office support for Secolsky, or arranging for Plaintiff and Secolsky to meet only in public spaces at the University.  The problem with these suggestions is that by July 2014, Plaintiff had agreed to enter into private employment with Secolsky, in a manner completely outside and separate from any academic University-based relationship they may have had in early 2014.  No more sexual harassment occurred, and Plaintiff has offered no proof that any harassing behavior from Secolsky took place in the context of the University after June 21, 2014.  Defendants cannot order two grown, capable adults to discontinue a private business relationship that they knowingly entered into (after Secolsky had sexually harassed Plaintiff) separate and independent from any connection to the University.  Thus, the court cannot say that Defendants had substantial control over Secolsky *and the context* in which any known harassment after June 2014 occurred, and thus cannot be liable for their indifference to harassment they

lacked the authority to prevent.  See *Doe-2*, 593 F.3d at 512.  Nothing Defendants did or

did not do after June 21, 2014, caused Plaintiff to undergo harassment or made her

liable or vulnerable to it.  See *Davis*, 526 U.S. at 645.  Defendants' response was not

"clearly unreasonable."  Summary judgment is granted for Defendants on Count XIV.

>  *Count XV (Stake, Hudson, and Johnson)*

Count XV of Plaintiff's Amended Complaint alleges that Defendants Stake,

Hudson, and Johnson denied Plaintiff substantive due process under § 1983 because

they were deliberately indifferent in that, after June 21, 2014, they (1) failed to take any

corrective action regarding Secolsky's unconstitutional conduct; (2) failed to prevent

him from further harassing Plaintiff; and (3) turned a blind eye towards his

unconstitutional conduct toward Plaintiff.

Plaintiff is suing Defendants in their individual capacities as supervisors of

Secolsky.  In order for a supervisor to be liable, they must be "personally responsible for

the deprivation of the constitutional right." *Chavez v. Illinois State Police*, 251 F.3d 612,

651 (7th Cir. 2001) (quoting *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995)). To

show personal involvement, the supervisor must "know about the conduct and

facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see."

*Jones v. City of Chicago*, 856 F.2d 985, 992–93 (7th Cir. 1988).

Thus, Defendants' liability under § 1983 as Secolsky's supervisors requires some

evidence that they knew about his sexual misconduct and facilitated, approved,

condoned, or turned a blind eye to it.  See *Trentadue*, 619 F.3d at 652.  The court need not

recite its entire analysis from Count XIV.  Therefore, for the reasons stated in the section above, Defendants were not deliberately indifferent to any violation of Plaintiff's constitutional rights.  Summary judgment is granted in favor of Defendants on Count XV.

*Count XX (Board of Trustees)*

In Count XX, Plaintiff alleges Defendants retaliated against her in violation of her rights under Title IX in reporting Secolsky's harassment by having Dr. Abelmann drop her from her OPT status.  Defendants argue that Plaintiff cannot prove the required elements of this claim as a matter of law.

Under a Title IX retaliation claim, a plaintiff must produce enough evidence for a reasonable jury to conclude that (1) she engaged in a statutorily protected activity; (2) the Board took a materially adverse action against her; and (3) there existed a but-for causal connection between the two.  *Burton v. Board of Regents of University of Wisconsin System*, 851 F.3d 690, 695 (7th Cir. 2017).

Defendants argue that Plaintiff cannot show they took a "materially adverse action" against her or that the loss of the OPT hours demonstrates a but-for causal connection.  With regard to the adverse action element, Plaintiff claims that the removal of her twenty hours of OPT was a "materially adverse action" because the elimination of Abelmann's sponsorship "removed one of only two safeguards separating [Plaintiff] from falling out of compliance with her immigration status."  The court is sympathetic to this argument.  However, assuming *arguendo* that Plaintiff can show the loss of the

52

OPT hours was a "materially adverse action," Plaintiff must still demonstrate that there existed a but-for causal connection between Misa's informing Hudson and Abelmann's termination of her OPT status.

For this third element of a Title IX retaliation claim, Plaintiff must show that her complaints to ODEA were a "substantial or motivating factor" in Abelmann's decision to terminate her OPT status, which may be done via direct evidence (which would entail something akin to an admission by the employer) or circumstantial evidence that presents a 'convincing mosaic' of circumstantial evidence that would permit the same inference (of retaliation) without the employer's admission. *Milligan v. Board of Trustees of Southern Illinois University*, 686 F.3d 378, 388 (7th Cir. 2012). Such circumstantial evidence may consist of (1) suspicious timing, ambiguous statements oral or written, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of causation might be drawn; (2) evidence showing that the employer systematically treated other, similarly situated employees better; or (3) evidence that the employer's justification for the adverse action was pretextual. *Milligan*, 686 F.3d at 388-89.

Defendants assert, and Plaintiff concedes (see pgs. 38-39 of Plaintiff's Response (#144)), that the only evidence of a causal connection for retaliation is suspicious timing, in that Abelmann's termination of Plaintiff's OPT status came just one day after Julie Misa informed Hudson about that OPT status. In egregious cases, suspicious timing alone might create a triable issue on causation. *Milligan*, 686 F.3d at 389. In *Loudermilk*

*v. Best Pallet Co.*, 636 F.3d 312, 315 (7th Cir. 2011), the court found suspicious timing

alone sufficient where the plaintiff was fired immediately, on the spot, when he

presented his superior with a note alleging racial discrimination in the workplace.  The

court wrote that "[o]ccasionally [] an adverse action comes so close on the heels of a

protected act that an inference of causation is sensible[,]" noting that "[t]he closer two

events are, the more likely that the first caused the second."  *Loudermilk*, 636 F.3d at 315.

However, such cases like *Loudermilk*, where temporal proximity alone allows for an

inference of causation, are rare. *Milligan*, 686 F.3d at 390. Under ordinary circumstances,

close temporal proximity provides evidence of causation and may permit a plaintiff to

survive summary judgment provided that there is *other evidence* that supports the

inference of a causal link.  *Milligan*, 686 F.3d at 390.

 Plaintiff argues that her situation is like the one present in *Loudermilk*, since her

OPT hours with Abelmann were dropped close on the heels of Hudson being informed

of Plaintiff's OPT status.  However, the court finds *Loudermilk* distinguishable.  First,

and importantly, *Loudermilk* required that the adverse action come immediately after

the *protected act*.  *Loudermilk*, 636 F.3d at 315.  Here, the protected act in question was not

Misa informing Hudson of Plaintiff's OPT status on August 14, 2014, but rather

Plaintiff's reporting of Secolsky's behavior to ODEA in June 2014.  Plaintiff cites to no

case law holding that the temporal proximity clock begins ticking once the employer is

informed of the possibility of taking a certain type of adverse action.  Rather, the case

law cited in *Loudermilk* and *Milligan* is clear that the two actions measured in the

temporal proximity question are the initial protected act and the adverse action.  The time between the protected act and the adverse action was nearly two months, far exceeding the extremely short amount of time required for temporal proximity alone to create a triable issue on causation.  See *Milligan*, 686 F.3d at 389-90.  It should also be noted that in *Loudermilk*, the plaintiff was fired instantaneously, essentially on the spot, by her employer when engaged in the protected activity.  Here, under even the most generous reading of Plaintiff's version of the facts, she was dropped from OPT months after engaging in the protected activity, and the action was taken by someone completely unconnected to the ODEA investigation.

The Seventh Circuit has characterized cases where temporal proximity alone suffices, with no other evidence, as "egregious" and "rare[.]" *Milligan*, 686 F.3d at 389-90.  This is not such a case.  Rather, this case falls under the "ordinary circumstances," where close temporal proximity (if two months can be considered close temporal proximity) "provides evidence of causation and may permit a plaintiff to survive summary judgment *provided that* there is other evidence that supports the inference of a causal link.'" *Milligan*, 686 F.3d at 390, quoting *Scaife v. Cook County*, 446 F.3d 735, 742 (7th Cir. 2006) (emphasis added by the court in *Milligan*).  As noted above, there is no "other evidence" supporting the inference of a causal link.  Therefore, judgment must be granted in favor of Defendants on Count XX.

IT IS THEREFORE ORDERED:

(1) Plaintiff's Motion for Summary Judgment (#124) is GRANTED in part, and

DENIED in part.  Defendant Secolsky's Motion for Summary Judgment (#132) is GRANTED in part and DENIED in part.  Defendant Stake's Motion for Summary Judgment (#126) is GRANTED. Defendants Board of Trustees, Hudson, and Johnson's Motion for Summary Judgment (#125) is GRANTED.

(2) Judgment is granted in favor of Plaintiff and against Secolsky on Count I and against Stake on Count XI.  Judgment in favor of Secolsky is granted on Count IX as to the equal protection racial claim and the substantive due process bodily integrity claim, but is denied on the equal protection sex/gender claim.  Judgment is granted in favor of Defendant Board of Trustees and against Plaintiff on Counts XIV and XX.  Judgment is granted in favor of Defendants Stake, Hudson, and Johnson and against Plaintiff on Count XV.  Remaining for trial are: Counts II through IX against Defendant Secolsky; Counts X, XII, and XIII against Defendant Stake.  Defendants Hudson, Johnson, and the Board of Trustees are hereby terminated as Defendants.

(3) This case remains set for a telephone status conference on Friday, February 2, 2018, at 1:30 pm, before Magistrate Judge Eric I. Long.


ENTERED this 30th day of January, 2018.

s/ COLIN S. BRUCE
U.S. DISTRICT JUDGE